# Illinois Official Reports

## Appellate Court

---

**People v. Ferris, 2014 IL App (4th) 130657**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DUSTIN P. FERRIS, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-13-0657 |
| Filed | April 21, 2014 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Evidence of defendant's possession of methamphetamine was properly suppressed as "the fruit of the poisonous tree," since the vehicle in which defendant and two other people were riding was initially properly stopped for speeding, but the stop was unreasonably prolonged and resulted in an illegal search of the vehicle after the officer discovered that one passenger was unable to drive due to his health and another had a revoked license, another passenger's purse was unreasonably removed from the vehicle and searched by the officer in his squad car, and the vehicle was improperly subjected to an inventory search, towed, impounded, placed on hold, subjected to a walk-around by a drug-sniffing dog, and finally searched pursuant to a warrant. |
| Decision Under Review | Appeal from the Circuit Court of Moultrie County, No. 13-CF-18; the Hon. Dan L. Flannell, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Jeremy Richey, State's Attorney, of Sullivan (Patrick Delfino, David J. Robinson, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
|---|---|
| | Jude M. Redwood (argued), of Redwood Law Office, of St. Joseph, for appellee. |
| Panel | PRESIDING JUSTICE APPLETON delivered the judgment of the court, with opinion. <br> Justice Knecht concurred in the judgment and opinion. <br> Justice Pope dissented, with opinion. |

**OPINION**

¶ 1    The State charged defendant, Dustin P. Ferris, with unlawful possession of methamphetamine (720 ILCS 646/60(b)(5) (West 2012)). He moved to suppress the evidence against him. After an evidentiary hearing, the trial court granted his motion. The State filed a certificate of impairment and a notice of appeal.

¶ 2    We defer to the material findings of fact the trial court made in its written decision because those findings are not clearly erroneous. See *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006) (describing the dual standard of review applicable to a ruling on a motion for suppression). Therefore, we affirm the trial court's judgment. Indeed, the material facts appear to be undisputed. Given the material facts, we conclude, *de novo*, that suppressing the evidence in question was the legally correct decision. See *id.*

¶ 3    I. BACKGROUND

¶ 4    A. The Hearing on the Motion for Suppression
(July 25, 2013)

¶ 5    1. *The Testimony of Defendant*

¶ 6    On February 15, 2013, defendant was driving a 2001 Lincoln automobile belonging to Mindy Deweese. He had the car keys with her permission. Deweese and Gretchen Biddle were his passengers. The purpose of the trip was to give a friend of his a ride from Paris, Illinois, to Decatur, Illinois. They arrived in Decatur and dropped off the friend. While in Decatur, defendant drove the car on at least one occasion when Deweese was not riding along. Deweese knew that defendant's clothing and other personal belongings, including his book bag, were in the trunk of the car. After dropping off the friend, the three of them–defendant, Deweese, and Biddle–headed back to Paris that same day.

¶ 7        Initially, defendant was also the driver on the way back, but his eyes became dry and itchy. He requested Biddle to take over driving, even though he knew she lacked a valid driver's license. He sat in the front passenger seat as she drove.

¶ 8        It was about 11:30 p.m., and they were traveling east on Illinois Route 32, when a police officer pulled them over a couple of miles from Lovington. The area of the traffic stop was a blacktop road, to the right of which was a shoulder 10 or 15 feet wide and then a slightly sloping grassy ditch. The police officer claimed Biddle had been speeding.

¶ 9        Upon learning that Biddle's driver's license had been revoked, the police officer arrested her for driving with a revoked driver's license. He requested defendant's permission to search the car. Defendant said no. The police officer also requested Deweese's permission to search the car. She said no.

¶ 10       At the police officer's request, defendant underwent some field sobriety tests to determine if he was fit to drive. The police officer concluded that defendant was unfit to drive, and he warned defendant he would arrest him if he tried to do so.

¶ 11       Next, the police officer said he was going to perform an inventory search of the car before it was towed. Biddle's purse was on the front passenger floorboard, and during the inventory search, the police officer removed the purse from the car and put it in the squad car, even though defendant told him to leave the purse in the car and even though Biddle told him several times she wanted her purse left in the car.

¶ 12       After the inventory search, the police officer told defendant and Deweese they would have to come to the sheriff's office and wait for someone to pick them up. Defense counsel asked defendant:

             "Q. You testified you had to go to the Sheriff's Department. Why did you say you had to go there?

             A. He said we had to go there and wait for our friends to come get us.

             Q. Is that what you wanted to do?

             A. No. We wanted to wait at the car for somebody to come get us so we could take the car."

A tow truck arrived and took away the car. The police took defendant, Deweese, and Biddle to the sheriff's office in Sullivan.

¶ 13       Defendant or Deweese called a friend, Michael Evard, who finally arrived at the sheriff's office around dawn on February 16, 2013. Defendant testified:

             "A. We went to the tow truck company to see if we could get the car. It wasn't open yet, so we went to a gas station. Somebody stated she knew where the tow truck company driver lived. We went there. He wasn't there. His wife called him and asked him about the car, and he said the police officer put a hold on the car and they weren't going to release it to us.

             Q. So then what did you do?

             A. So, I went back to Paris."

¶ 14                              2. *The Testimony of Gretchen Biddle*

¶ 15       When the police officer arrested Biddle, her purse was on the front floorboard of the Lincoln. She never requested the police officer to get her purse. Rather, she told him several

times she wanted her purse left in the Lincoln with defendant.

¶ 16                                    3. *The Testimony of Michael Evard*

¶ 17       Evard was a friend of defendant and Biddle. Defendant telephoned him in Paris at about 1 a.m. on February 16, 2013, and asked him to come to Sullivan and pick him up at the sheriff's office. Evard brought along another licensed driver. It took some time to round up this extra driver and $117.50 for the towing fee, so it was dawn, approximately 6 a.m., when Evard arrived in Sullivan.

¶ 18       The Lincoln was in a building at Sullivan's Auto Body, across the street from the sheriff's office. Evard could see the car through a window of the building. By inquiring at a gas station, they found out where the tow truck driver was. They went to him and told him they wanted to pick up the car. He replied that was impossible because "there was a hold put on the car" and they "could not pick up the vehicle until the hold was off." Consequently, they returned to Paris without the Lincoln.

¶ 19                                    4. *The Testimony of Caleb Smith*

¶ 20       Caleb Smith was the Moultrie County deputy sheriff who pulled Biddle over. During Smith's testimony, the trial court admitted, without objection by defense counsel, a digital video disc (DVD), on which the traffic stop was recorded, as well as some documents Smith had prepared, namely, an "MCSO [(Moultrie County Sheriff's Office)]–Vehicle Tow Record" and a search affidavit. For the sake of simplicity, we will combine what Smith said in his search affidavit and what he said in his testimony.

¶ 21       At 12:14 a.m. on February 16, 2013, Smith was out in the country, monitoring the speed of vehicles going by on Illinois Route 32. A car went by, heading east, and the radar said it was traveling 70 miles per hour. The speed limit was 55 miles per hour.

¶ 22       He turned on the emergency lights of his squad car and pulled the car over. It was a 2001 four-door Lincoln. When the car came to a stop, it was not completely pulled over onto the shoulder, although the shoulder was wide enough to accommodate the car. The car straddled the fog line. Three-quarters of the car was in the eastbound lane, with the squad car behind. The trial court asked Smith:

> "Q. Is there some reason for safety you just didn't have them pull off the road?
>
> A. No. I did not have them pull off. There is no reason. I was behind it with my emergency red and blues.
>
> Q. Excuse me. So you were in the complete lane of traffic then, I assume?
>
> A. That's correct."

¶ 23       The dispatcher informed Smith that Mindy Deweese was the registered owner of the car and that her driver's license was suspended.

¶ 24       Smith walked up to the driver's side window, and the driver identified herself as Gretchen Biddle. She could not produce a driver's license; she claimed she had left it at home. Smith saw she had two passengers, defendant and Deweese. Smith remarked to the three occupants of the car that although they all were exposed to the same light, the pupils of the passengers' eyes looked contracted, whereas the pupils of Biddle's eyes looked normal. He asked the three of them if they had consumed any narcotics lately. All three answered no.

¶ 25     Smith requested Deweese's permission to search the car. She denied him permission to do so.

¶ 26     The dispatcher informed Smith that Biddle's driver's license had been revoked. Smith had Biddle get out of the car and perform some field sobriety tests, after which he decided not to arrest her for driving under the influence (DUI). He arrested her, however, for driving while her driver's license was revoked. He handcuffed her, put her in the back of the squad car, and returned to the Lincoln to speak with the two passengers.

¶ 27     Defendant was the only occupant of the car with a valid driver's license, but having seen his contracted pupils, Smith had reservations about his fitness to drive. Defendant told him he had been driving earlier but that he had requested Biddle to take over driving because his eyes had been bothering him. Smith administered to defendant a battery of field sobriety tests and determined he was unfit to drive. Smith explained this to defendant, who then admitted taking a couple of Vicodin pills that morning and smoking cannabis a few hours earlier.

¶ 28     In the DVD, after administering the field sobriety tests to defendant, Smith tells defendant that, in his opinion, defendant is under the influence and is unfit to drive. Smith assures defendant that because he was not driving at the time of the traffic stop, he is not in any trouble. But Smith tells him he may not drive in his present condition. "So, we need to decide what you guys are going to do with this car," Smith tells defendant. "We're going to have it towed," defendant replies.

¶ 29     According to Smith's affidavit, he told Deweese and defendant "to call for a ride because [he] would need to tow the vehicle since it was in the roadway and [he] had no valid or sober driver to drive the vehicle." While defendant and Deweese unsuccessfully tried to reach someone by cellular phone, Smith returned to Biddle in the squad car and read her the *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Biddle said she understood the warnings and that she was willing to talk. In her conversation with Smith in the squad car, she surmised that defendant and Deweese were under the influence and that the reason she had been enlisted to drive was that she was the only sober person in the car. Smith asked her if she thought that defendant and Deweese were on prescription pills, and she answered they probably were.

¶ 30     After radioing the dispatcher to send a tow truck, Smith returned to the Lincoln to speak again with defendant and Deweese. He told them a "Lovington [police] officer would give them a ride to the Moultrie County Sheriff's Office to the lobby to wait for a ride since the car would be towed." Deweese said she wanted to stay with the car until the tow truck arrived. Smith replied "that was fine but they would need to exit the car so [he] could conduct a tow inventory of the vehicle." Deweese "did not think that was right and thought it was pretty much like searching the car after she told [him he] couldn't." Smith explained to her that the purpose of a tow inventory "was to protect her belongings along with the tow company."

¶ 31     Over Deweese's protest, Smith performed the tow inventory. In the DVD, he can be seen with a flashlight and clipboard, opening car doors and leaning into the car. A couple of times, when he was near a bag in the trunk, defendant and Deweese "told [him] it was just clothes[,] which [he] quickly flipped through." While he was searching the front passenger side of the car, he "located a purse and asked [defendant and Deweese] if it was [Biddle's,] and they said yes." Then, without consulting Biddle, he took the purse out of the Lincoln and set it on the front passenger seat of the squad car "because it appeared to have a lot of items inside." It was his "own policy and custom" to "always take women's purses with [him] to the jail because

they ha[d] valuables, money and other items they [might] need with them." He further explained in the suppression hearing: "[T]hat way I'm not leaving the tow company responsible for different valuables, their money, credit cards, anything they may need to bond out, cell phone, with the vehicle. It's something I've always done." According to Smith, nobody told him to leave the purse in the Lincoln, and by the same token, nobody asked him to take it out of the Lincoln, either.

¶ 32 In the form entitled "MCSO–Vehicle Tow Record," signed by Smith, there is a section for describing the car (*e.g.*, the make, model, year, and vehicle identification number) and for identifying its operator and owner, another section for describing the "Reason for Towing" (the box corresponding to "arrest" is checked), and a third section for the "Inventory." In this third section, Smith describes the "Apparent Condition" of the Lincoln as "Fair," and next to the preprinted words "Inventory of Personal Items in Vehicle," he notes: "Black cubs bag containing clothes, jacket clothing and blankets in trunk." At the bottom of the form is the preprinted language "The above vehicle has been released to me and I found its condition to be as indicated above." Below this language is the signature of John Green, the tow truck driver. Green signed the form on February 16, 2013, at 1:41 a.m., one minute after Smith completed the inventory search of the car.

¶ 33 After John Green Towing arrived and towed away the Lincoln, Smith took Biddle to the Moultrie County Detention Center. They arrived there at 1:51 a.m. He brought Biddle's purse in with him, and he and the correctional staff inventoried its contents pursuant to "Correctional policy." In the purse, they found 40 pseudoephedrine pills, 9 oxycodone pills, 10 coffee filters powdered with a white substance that field-tested positively for methamphetamine, 4 Baggies of white powder that likewise field-tested positively for methamphetamine, 2 capsules containing white powder that field-tested positively for pseudoephedrine, a small mirror, a razor blade, and an electric scale.

¶ 34 "[B]ecause it was reasonable to believe that there would be further drugs inside the vehicle," Sergeant Gary Carroll "agreed to place a hold on the vehicle" until they could obtain a dog from Coles County. It was around 3 a.m. on February 16, 2013, when someone in the sheriff's office called Green and placed a hold on the car. (Evidently, because Smith had "released" the car to Green, as noted in the MCSO–Vehicle Tow Record, the police concluded they no longer had a sufficient custodial interest in the car justifying a second inventory search. See *People ex rel. Burmila v. One 1987 Cadillac, VIN 1G6CD118XH4317299*, 206 Ill. App. 3d 407, 409-10 (1990) ("A private company then towed and stored the vehicle. According to the tow report, the vehicle was initially eligible for release. Under these circumstances, we find that the police did not have a sufficient custodial interest to justify the search which uncovered the cocaine.").) Deweese's friends arrived to pick her up and drive the Lincoln home. While the police were waiting for the dog to arrive from Coles County, she and her friends kept calling about the Lincoln. When they learned that the police were holding the Lincoln until a dog walked around it, "they were very unhappy and did not want [the police] to search the vehicle."

¶ 35 The dog arrived around 8:45 a.m. The prosecutor asked Smith:

"Q. And did he alert on the car?

A. Yes.

Q. And what does an alert mean?

A. It means he smells the odor or presence of meth. In other cases it's any other kind of narcotics he is trained to identify.

Q. Based on that information, did you go to seek a search warrant?

A. Yes, I did."

¶ 36    Smith obtained a search warrant, and he and Carroll executed it. This time, Smith searched the trunk more thoroughly than he had searched it during the inventory search at the scene of the traffic stop. In the back of the trunk, in the driver's side corner, behind a lot of clothing, he found a book bag. Inside the book bag, he found methamphetamine-manufacturing materials and 479 grams of methamphetamine solution. This was the evidence that tended to incriminate defendant and that he moved to suppress.

¶ 37                              B. The Trial Court's Decision

¶ 38    In a written decision, entered on July 26, 2013, the trial court began with two findings: (1) the traffic stop was valid because the Lincoln had been speeding, and (2) the arrest of Biddle was valid because she had been driving while her driver's license was revoked.

¶ 39    In the trial court's view, the case "hinge[d] in large measure" on Smith's removal of Biddle's purse from the Lincoln after he secured her in the squad car. The court saw no need to decide whether Biddle had affirmatively told Smith to leave the purse with defendant and Deweese. It was undisputed that Biddle never requested Smith to remove her purse from the Lincoln and bring it to the jail. But Smith did so anyway. The court found: "The officer's decision to remove the purse was based upon a combination of department policy and the officer's individual particular course of dealing in such situations."

¶ 40    The trial court held that Smith's removal of the purse from the Lincoln was a seizure of the purse and that, in the absence of a request to remove the purse from the Lincoln, the seizure was unreasonable. Because the seizure of the purse was unreasonable, so was the inventory search of the purse at the jail, the court reasoned. The contraband the police discovered during the inventory search of the purse led them to put a hold on the Lincoln, walk a dog around it, obtain a warrant, and ultimately search the Lincoln pursuant to the warrant. "[T]herefore," the court concluded, "the hold on the vehicle was improper and unjustified and the results of the search pursuant to the search warrant [had to] be suppressed."

¶ 41                              II. ANALYSIS
¶ 42                        A. Defendant's Standing To Claim a
                          Violation of the Fourth Amendment

¶ 43    The threshold question is whether defendant has standing to object to any violation of the fourth amendment (U.S. Const., amend. IV) in the circumstances of this case. In this context, we are not using the term "standing" in the ordinary sense of having a "personal stake in the outcome of the controversy" (*Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 530 (1983)), but in the more specialized sense of the defendant's personally having a fourth-amendment right that the government violated. Fourth-amendment rights are personal, and the government violates a defendant's fourth-amendment rights by invading the defendant's *own* legitimate expectation of privacy. *United States v. Payner*, 447 U.S. 727, 731 (1980). If all the government does is invade someone else's legitimate expectation of privacy, the defendant lacks standing to invoke the exclusionary rule of fourth-amendment jurisprudence. *Id.*

¶ 44    The State is correct that defendant had no legitimate expectation of privacy as to Biddle's purse (see *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980)), but he had a legitimate expectation of privacy as to his book bag, which was in the trunk of the car (see *People v. Manke*, 181 Ill. App. 3d 374, 378 (1989)). It is true that the police obtained a warrant to search the car and its contents, including the book bag. Even so, obtaining a search warrant does not confer legality upon searches and seizures preceding the issuance of the warrant. *People v. Scaramuzzo*, 352 Ill. 248, 253 (1933). If the initial search or seizure is unlawful, it "can form [no] basis for the issuance of a search warrant[,] and evidence so obtained is inadmissible." *People v. Bowen*, 164 Ill. App. 3d 164, 177 (1987). See also *People v. Koniecki*, 135 Ill. App. 3d 394, 401 (1985).

¶ 45    To be entitled, then, to the suppression of the evidence the police found in his book bag, defendant must show he has standing to object to an initial violation of the fourth amendment that, under the principles of *Wong Sun v. United States*, 371 U.S. 471 (1963), tainted the subsequently issued search warrant. If defendant's own fourth-amendment rights were untouched by any previous illegality, he himself would have no basis for challenging the search warrant. See 6 Wayne R. LaFave, Search and Seizure § 11.4, at 324-25 (5th ed. 2012) ("[I]t must be cautioned that a defendant *** can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree.").

¶ 46    According to the supreme court, standing to claim a violation of the fourth amendment depends on whether "[the] defendant has a reasonable expectation of privacy in the area searched or in the items seized." *People v. Kidd*, 178 Ill. 2d 92, 136 (1997). See also *People v. Johnson*, 114 Ill. 2d 170, 191 (1986) ("The fourth amendment protection against unreasonable government search and seizure extends only to individuals who have a reasonable expectation of privacy in the place searched or the property seized."). "The question of whether a defendant has established a legitimate expectation of privacy sufficient to permit him to contest a search or seizure is a question of law[,] and our review is *de novo*." *People v. Rosenberg*, 213 Ill. 2d 69, 77 (2004).

¶ 47    Because a traffic stop is a seizure under the fourth amendment (*People v. Bunch*, 207 Ill. 2d 7, 13 (2003)), Smith seized Deweese's car by pulling it over. Defendant does not challenge the trial court's finding that Biddle was speeding and that Smith therefore had probable cause to pull her over. See *Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Nevertheless, even though the seizure of a car is lawful in its inception, the seizure can subsequently violate the fourth amendment by being unreasonably prolonged. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *People v. Cummings*, 2014 IL 115769, ¶ 18.

¶ 48    Does defendant have standing to argue that the police violated the fourth amendment by towing and placing a hold on Deweese's car, thereby unreasonably prolonging the seizure of the car? It depends on whether he had a legitimate expectation of privacy as to the car. See *Rosenberg*, 213 Ill. 2d at 77; *Kidd*, 178 Ill. 2d at 136; *Johnson*, 114 Ill. 2d at 191; *People v. Davis*, 93 Ill. App. 3d 217, 226 (1981).

¶ 49    True, defendant had no ownership interest in Deweese's car. But property ownership is merely "a factor to be considered in determining whether an individual has standing to test the constitutionality of a search and seizure"; it is "not dispositive." *Kidd*, 178 Ill. 2d at 135. The supreme court has held:

"Other factors relevant in determining the existence of a reasonable expectation of privacy include whether the defendant was legitimately present in the area searched; whether the defendant had a possessory interest in the area or the property seized; whether the defendant had previously used the area searched or the area seized; whether the defendant had the ability to control the property or to exclude others from using it; and whether the defendant had a subjective expectation of privacy in the property. [Citation.] The question whether a defendant has a reasonable expectation of privacy in the area searched or in the items seized must be answered in light of the totality of the circumstances of the particular case. [Citation.]" *Id.* at 135-36.

¶ 50    Defendant was legitimately present in Deweese's car, and he had a possessory interest in his own book bag, clothing, and other personal belongings, which were stored in the trunk. Deweese had given him the keys to the car and had allowed him to drive it on his own personal errand. He had driven the car in Decatur without her riding along. Deweese could not have legally driven the car, considering that she lacked a valid driver's license, and therefore, during the road trip, she was dependent on defendant as the only licensed driver. By his physical possession of the keys, he had the ability to exclude others from using the car, and apparently, by the same token, he had the ability to allow someone else to use the car, since Deweese did not object when he requested Biddle to take over driving. According to defendant's testimony, which the trial court was entitled to believe, he originally was driving, and it was at his own request that Biddle took over driving. Defendant was the one who told Smith, "We're going to have [the car] towed." He further demonstrated a subjective expectation of privacy as to the car by refusing Smith permission to search the car.

¶ 51    Because Deweese, a nondriver, had more or less put defendant in charge by handing over to him the car keys and because she had allowed him to stuff the trunk of the car with his belongings and embark on a rather long trip for his own personal purposes, defendant's expectation of privacy as to the car was reasonable. It is not an expectation that "society" would regard as baseless or irrational. *Id.* at 135. Defendant was not someone whose only significance was that he occupied a passenger's seat. He was not like the passengers in *Rakas v. Illinois*, 439 U.S. 128, 148 (1978), whose only connection to the vehicle was that they were " 'legitimately on [the] premises.' " While holding, in *Rakas*, that legitimate presence was not enough, the Supreme Court disavowed any intention to hold that a passenger had to own the vehicle, or even have a possessory interest in the vehicle, to invoke the exclusionary rule and challenge a search of the vehicle. *Id.* at 149 n.17. Ownership and a possessory interest are factors, but they are not dispositive. *Kidd*, 178 Ill. 2d at 135-36. All the Supreme Court required was that the passenger have "[a] legitimate expectation of privacy in the areas of the car which were searched." *Rakas*, 439 U.S. at 149 n.17. Someone who was simply a passenger–"a passenger *qua* passenger"–"normally" would have no "legitimate expectation of privacy" in, for example, "the trunk of an automobile." *Id.* at 148-49.

¶ 52    We have held, however, that if a passenger had a set of keys to the car and was storing his clothes in the car during a long road trip, he had a legitimate expectation of privacy as to the car. *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000); see also *People v. Taylor*, 245 Ill. App. 3d 602, 611 (1993) ("Any of us traveling for an extended period of time in a car, in which we stored our belongings, would expect a certain amount of privacy over the duration of that trip."). Granted, the trips in *Sparks* and *Taylor* were a lot longer than the trip in the present case. The car in *Sparks* had come from Texas (*Sparks*, 315 Ill. App. 3d at 792), and the car in

*Taylor* was on its way back to Colorado (*Taylor*, 245 Ill. App. 3d at 603), whereas, by comparison, it is 81 miles between Paris and Decatur. So, the present case is somewhere between *Rakas* and *Sparks*. But it is closer to *Sparks* than to *Rakas*. The length of the trips in *Sparks* and *Taylor* explained why the passengers (like defendant) had clothing and luggage in the trunks of the vehicles. If the owner hands over to someone the keys to her car and allows him to use the trunk as his traveling wardrobe, he has a legitimate expectation of privacy as to the car, regardless of whether he has a legally enforceable possessory interest in the car. See *Rakas*, 439 U.S. at 143 ("[A]rcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."). It is true that, under property law, Deweese, as the titleholder to the car, had the right to exclude anyone from the car and to invite others into the car and allow them to store their luggage in the trunk, right next to the items already in the trunk. But the same apparently was true of the owners of the vehicles in *Sparks* and *Taylor*. For fourth-amendment purposes, the legitimate expectation of privacy is broader than property law. *Id.* at 143, 149 n.17. One can have a legitimate expectation of privacy without being entitled to an injunction in civil court.

¶ 53    In sum, defendant was more than a mere passenger; he was more than someone who occupied a passenger's seat. Under the totality of the circumstances, he had a legitimate expectation of privacy as to Deweese's car, an expectation that society would accept as reasonable. Therefore, he has standing to object to an unreasonably prolonged seizure of the car. See *Rosenberg*, 213 Ill. 2d at 77; *Kidd*, 178 Ill. 2d at 136; *Johnson*, 114 Ill. 2d at 191; *Davis*, 93 Ill. App. 3d at 226. If the towing of the car was an unreasonable prolongation of its seizure, defendant was not required to remove his book bag from the trunk before the car was towed away, contrary to the dissent's argument, because he was entitled to expect that the car would not be towed in the first place.

¶ 54                    B. Did the Police Unreasonably Prolong the Seizure of the Car?

¶ 55    Having concluded, *de novo*, that defendant has standing to challenge a seizure of the car (see *Rosenberg*, 213 Ill. 2d at 77), we take up the next question: whether the seizure of the car was indeed unreasonably prolonged (see *Caballes*, 543 U.S. at 407; *Cummings*, 2014 IL 115769, ¶ 18).

¶ 56    "*Caballes* links the reasonableness of a traffic stop's duration to the reason for the stop." *Id.* ¶ 19. In the present case, the reason for the traffic stop was, initially, speeding, and soon Smith became aware of an additional traffic violation: Biddle's driving while her driver's license was revoked. Once Smith arrested Biddle and put her in the back of the squad car, his business was accomplished, and his seizure of the Lincoln should have ended–unless he had a legitimate noninvestigatory reason for prolonging his seizure of the car, that is, unless his towing of the car was a reasonable exercise of his community-caretaking function as a police officer. See *People v. Nash*, 409 Ill. App. 3d 342, 347 (2011) ("An impoundment must either be supported by probable cause or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation.").

¶ 57    There must be a standard police procedure authorizing the towing of the car in the first place. *Colorado v. Bertine*, 479 U.S. 367, 376 n.7 (1987); *People v. Clark*, 394 Ill. App. 3d 344, 349 (2009); *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (" '[d]iscretion as to impoundment is permissible so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of

criminal activity' " (quoting *United States v. Jackson*, 682 F.3d 448, 454 (6th Cir. 2012))); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) ("Among those criteria which must be standardized are the circumstances in which a car may be impounded."); 3 Wayne R. LaFave, Search and Seizure § 7.3(c), at 825 (5th ed. 2012). Otherwise, in the unbridled exercise of his or her discretion, the police officer could opt for a police tow in order to create the occasion for an inventory search–which really would be an investigatory search in the guise of an inventory search. See *Florida v. Wells*, 495 U.S. 1, 4 (1990). Freewheeling discretion enables pretense. There must be regulatory safeguards against pretense in the fulfillment of community-caretaking functions, such as the impoundment of vehicles. See *id.*

¶ 58      In the two federal cases the State cites, *Bertine*, 479 U.S. at 368 n.1, and *South Dakota v. Opperman*, 428 U.S. 364, 365 (1976), municipal ordinances authorized the towing of the vehicles. And in the Illinois case the State cites, *People v. Hundley*, 156 Ill. 2d 135, 136 (1993), section 4-203(d) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, ¶ 4-203(d)) authorized the towing. In the present case, it is unclear what statute or other standard police procedure authorized the towing of the Lincoln, a mechanically sound vehicle that was attended by its owner. Section 4-203 of the Illinois Vehicle Code (625 ILCS 5/4-203 (West 2012)) is entitled "Removal of motor vehicles or other vehicles; Towing or hauling away," and none of its subsections apply to the facts of this case. Section 11-1302 of the Illinois Vehicle Code (625 ILCS 5/11-1302 (West 2012)) is entitled "Officers authorized to remove vehicles," and none of its subsections are applicable, either. As a matter of law, taking defendant and Deweese to the sheriff's office to wait for friends did not justify towing the car. See *Clark*, 394 Ill. App. 3d at 348 ("[T]he fact that [the] defendant's car would be left unattended is not a sufficient reason for impoundment unless the car would be illegally parked.").

¶ 59      The "MCSO–Vehicle Tow Record" has a box for "Arrest" in the section entitled "Reason for Towing." But towing the vehicle in every case in which the driver is arrested would be unreasonable. *Duguay*, 93 F.3d at 353 ("[I]mpoundment based solely on an arrestee's status as a driver, owner, or passenger is irrational and inconsistent with 'caretaking' functions. Under either Detective Waldrup or Detective Adams' policies, towing is required any time the arrestee is carted off to jail, regardless of whether another person could have removed the car and readily eliminated any traffic congestion, parking violation, or road hazard.").

¶ 60      The Supreme Court has stated: "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman*, 428 U.S. at 369. Granted, the Lincoln, with the squad car behind it, was obstructing traffic on Illinois Route 32 during the traffic stop. The Lincoln was three-quarters of the way over the fog line, in the eastbound lane. That just happened to be where Biddle came to a halt when Smith pulled her over. Smith was unable to give any reason for failing to have her pull completely over onto the shoulder and out of the way of traffic. As one can see by watching the DVD of the traffic stop, the shoulder of the highway was of ample width, and the car easily could have been driven a few feet over so that it was completely on the shoulder. Smith admitted as much in his testimony. As far as we know, it was not illegal to leave a vehicle parked on the shoulder of Illinois Route 32, provided that the vehicle was removed within 24 hours. See 625 ILCS 5/4-203(c) (West 2012). There would have been no danger of defendant's driving the Lincoln in his impaired state, or of Deweese's driving it in her unlicensed state, because Smith had them both taken to the sheriff's office to await the arrival of an alternative driver.

¶ 61 If the justification of the police tow was removing an obstruction to traffic, that justification seems inconsistent with common sense, considering that Smith could have had Biddle pull all the way over in the first place or, if he failed to do that, the car easily could have been driven or pushed the rest of the way onto the shoulder. In *People v. Buffo*, 202 Ill. App. 3d 240, 242 (1990), the appellate court stated:

> "[W]e believe that the possibility of an arrest resulting from a routine traffic stop is sufficiently high that the police should pull a vehicle over to a legal parking space or, at least, to a point in the road at which the vehicle will not obstruct traffic. Having failed to do so, [the police officer] could not take advantage of that failure to enter [the] defendant's car on the pretext of an exigent circumstance."

Thus, by the logic of *Buffo*, it was Smith's obligation to have Biddle pull the car all the way over onto the shoulder at the initiation of the traffic stop, and because he failed to do so, the State cannot reasonably rely on illegal parking as a justification for the community-caretaking function, *i.e.*, the police tow. See *id.* A community-caretaking function has to be reasonable under the circumstances, not pretextual.

¶ 62 The State argues that even if illegal parking did not justify the police tow, defendant is in no position to complain "[s]ince defendant suggested and agreed to have the car towed." The State appears to rely on a principle analogous to invited error. "Simply stated, a party cannot complain of error *** to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). But defendant never consented to a police tow. Neither did Deweese. Here is what happened, as shown in the DVD. After administering the field sobriety tests to defendant and determining he was unfit to drive, Smith told him, "You need to decide what you're going to do with this car." Defendant replied, "We're going to have it towed." He did not thereby invite, suggest, or consent to a police tow. Rather, he said, "*We're* going to have it towed." (Evidently, he or Deweese had a cell phone.) A police tow prolonged the seizure; a private tow would not have done so.

¶ 63 In sum, the record appears to contain no evidence of a standard police procedure authorizing a police tow in these circumstances, as opposed to just moving the vehicle out of the lane of traffic. Because the police tow was an exercise of unguided discretion, it unreasonably prolonged the seizure of the car after the initial traffic stop. See *Caballes*, 543 U.S. at 407; *Wells*, 495 U.S. at 4; *Bertine*, 479 U.S. at 375, 376 n.7; *People v. Gipson*, 203 Ill. 2d 298, 304 (2003); *Clark*, 394 Ill. App. 3d at 349; *Duguay*, 93 F.3d at 351; LaFave, *supra* § 7.3(c), at 825.

¶ 64 Afterward, the police further prolonged the seizure by placing a hold on the car while awaiting the arrival of the dog. The State cites no authority holding that if the police find contraband in the driver's purse, they may refuse to relinquish the car to its owner while waiting several hours for the arrival of a drug-sniffing dog. Even if the police tow was a legitimate caretaking function and therefore a reasonable prolongation of the seizure, it does not follow that the subsequent hold on the car, lasting several hours, likewise was reasonable.

¶ 65                                  C. Fruit of the Poisonous Tree

¶ 66 Under the doctrine known as "the fruit of the poisonous tree," a violation of the fourth amendment is considered to be, metaphorically, the poisonous tree, and any evidence the government obtained by exploiting that violation is subject to suppression as fruit of the poisonous tree. *People v. Henderson*, 2013 IL 114040, ¶ 33. The Supreme Court has explained

how to determine whether evidence is fruit of the poisonous tree. The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Internal quotation marks omitted.) *Wong Sun*, 371 U.S. at 488. In other words, to use a different metaphor, "a court must consider 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' " *Henderson*, 2013 IL 114040, ¶ 33 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)).

¶ 67       If the police had not towed the car and placed a hold on it, they never would have had the opportunity to walk a dog around the car, and they never would have acquired probable cause to support the issuance of a search warrant. In our *de novo* review, we find no attenuation or interruption of the causal sequence extending from the unreasonable towing of the car to the issuance of the tainted search warrant. See *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1111 (8th Cir. 2007); *United States v. Johns*, 891 F.2d 243, 244 (9th Cir. 1989). Therefore, we uphold the suppression of the evidence. It is fruit plucked from the poisonous tree.

¶ 68                                    III. CONCLUSION
¶ 69       For the foregoing reasons, we affirm the trial court's judgment.

¶ 70       Affirmed.

¶ 71       JUSTICE POPE, dissenting.
¶ 72       Because I believe the police tow of Deweese's vehicle was reasonable under the circumstances, I respectfully dissent.

¶ 73       The majority concedes defendant "had no legitimate expectation of privacy as to Biddle's purse." *Supra* ¶ 44. However, the majority recasts the issue and focuses instead on whether "defendant [had] standing to argue that the police violated the fourth amendment by towing and placing a hold on Deweese's car, thereby unreasonably prolonging the seizure of the car." *Supra* ¶ 48.

¶ 74       Assuming defendant, a passenger in the vehicle at the time of the stop, had an expectation of privacy in his bag, I question whether that expectation continued into the next day, after defendant voluntarily left his bag in a vehicle he did not own, knowing the vehicle was going to be towed. Regardless, I disagree with the majority's position it was improper for the police to have the vehicle towed.

¶ 75       Police are explicitly empowered to seize and remove from the streets any vehicle that impedes traffic or threatens public safety and convenience pursuant to their community-caretaking authority. *People v. Nash*, 409 Ill. App. 3d 342, 348 (2011) (citing *Opperman*, 428 U.S. at 369 (authority of police to remove vehicles impeding traffic or threatening public safety is beyond challenge)). The majority concedes Deweese's vehicle was "obstructing traffic on Illinois Route 32" as it was "three-quarters of the way over the fog line, in the eastbound lane." *Supra* ¶ 60. An illegally parked car is a sufficient reason to order a tow. See *People v. Mason*, 403 Ill. App. 3d 1048, 1054 (2010) (the fact the defendant's car would be

left unattended without the tow is an insufficient reason for impoundment *unless* the vehicle would be parked illegally); *Clark*, 394 Ill. App. 3d at 348. I would find the tow of the vehicle consistent with police community-caretaking functions.

¶ 76 The majority, citing *People v. Buffo*, finds it was the officer's "obligation to have Biddle pull the car all the way over onto the shoulder." *Supra* ¶ 61. However, the language the majority relies on in *Buffo* is *dicta* and unsupported by case law. See *Buffo*, 202 Ill. App. 3d at 242. Moreover, that case did not involve a police tow of the defendant's vehicle. Instead, in *Buffo*, an officer entered the defendant's vehicle to move it from its illegally parked location and discovered a weapon on the floorboard. *Buffo*, 202 Ill. App. 3d at 241. The defendant filed a motion to suppress and the State unsuccessfully argued the fact the vehicle was illegally parked was an exigent circumstance justifying the officer's entry into the vehicle. *Buffo*, 202 Ill. App. 3d at 242.

¶ 77 Here, the issue was not the officer's entry into the vehicle. Instead, the question is the reasonableness of the tow. Defendant failed field sobriety tests and Deweese did not have a license. Thus, no one at the scene was able to drive the vehicle. The DVD of the stop shows the police exhibited a great deal of patience and afforded defendant and Deweese time to make arrangements to have the vehicle moved. However, they were ultimately unable to get it done themselves. It was only at that point Smith arranged for the tow. While the majority characterizes Officer Smith's decision to have the vehicle towed "an exercise of unguided discretion" (*supra* ¶ 63), it was certainly preferable to leaving the scene where the vehicle posed a hazard to traffic and trusting defendant or Deweese not to drive away.

¶ 78 Based on the totality of the circumstances, I would find the towing of the vehicle was reasonable and did not result in an unreasonably prolonged seizure of the vehicle. The hold was placed on Deweese's vehicle only after drugs were discovered in Biddle's purse. Thereafter, the officers applied for and received a search warrant. Accordingly, I would reverse the trial court's grant of defendant's motion to suppress in this case.