2018 IL App (4th) 170440

NOS. 4-17-0440

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | McLean County |
| JOSHUA THOMAS, | ) | No. 17CF34 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Robert Freitag, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Turner concurred in the judgment and opinion.

**OPINION**

¶ 1        The McLean County circuit court held that after a police officer gave defendant, Joshua Thomas, a warning for an obstructed windshield (625 ILCS 5/12-503(c) (West 2016)) and ended the traffic stop, the officer lacked reasonable suspicion to detain him further for a dog sniff. Consequently, the court granted defendant's motion to suppress the cannabis the dog had smelled in his motor vehicle and which the police had found in an ensuing search. Having filed a certificate of impairment (see *People v. Young*, 82 Ill. 2d 234, 247 (1980)), the State appeals (see Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017)). In our *de novo* review, we likewise find no reasonable suspicion to justify detaining defendant for the dog sniff. Therefore, we affirm the judgment.

¶ 2                                        I. BACKGROUND

¶ 3                                        A. The Charges

¶ 4        The information had three counts. Count I charged defendant with trafficking in cannabis (more than 2500 grams) (720 ILCS 550/5.1(a) (West 2016)), count II charged him with unlawful possession of cannabis with the intent to deliver it (more than 5000 grams) (*id.* § 5(g)), and count III charged him with unlawful possession of cannabis (more than 5000 grams) (*id.* § 4(g)).

¶ 5                    B. Defendant's Motion for Suppression of Evidence

¶ 6        Defendant moved to suppress the introduction of the cannabis as evidence against him. His motion argued that the police officer who pulled him over for an obstructed windshield "unreasonably prolonged the duration of the stop," thereby subjecting him to an "unlawful seizure."

¶ 7                    C. The Hearing on Defendant's Motion for Suppression

¶ 8                        1. *Henkel's Testimony*

¶ 9        On May 26, 2017, the trial court held a hearing on defendant's motion for suppression. Defendant called Evan Henkel, who testified substantially as follows.

¶ 10        Henkel had been a police officer for over 10 years. He currently was a McLean County deputy sheriff, a position he held on January 15, 2017.

¶ 11        On that date, around 9:45 a.m., he was parked in the median of Interstate 74, near Carlock, Illinois, when he saw a black GMC Yukon sports utility vehicle (SUV) with Washington state license plates going east at 68 miles per hour. The SUV was within the 70-mile-per-hour speed limit. Nevertheless, Henkel, whose squad car was facing west, noticed that a bandana was hanging from the rearview mirror of the SUV, and the bandana looked wide enough to be a material obstruction of the driver's view (see 625 ILCS 5/12-503(c) (West 2016)).

¶ 12    Henkel followed the SUV and pulled up next to it, on the left. That is what he typically did before pulling someone over: pull up alongside the vehicle to see how many people were in the vehicle and to observe their reaction when they saw his marked squad car. Defendant appeared to be the only person in the SUV, and he would not look over at Henkel as they went side by side down the highway. Instead, defendant kept his gaze riveted straight ahead as he held onto the steering wheel tightly at 10 o'clock and 2 o'clock. This tunnel vision seemed "very strange and odd behavior" to Henkel. In his experience, almost everyone would look over at him.

¶ 13    Henkel slowed down so as to get behind defendant, and he turned on his emergency lights. Defendant pulled off the highway, onto the right shoulder, and stopped next to a guardrail.

¶ 14    Henkel walked up to the driver's side window of the SUV and introduced himself. Defendant continued to look straight ahead and would not look at Henkel. He appeared to be very nervous, and, in response to Henkel's questions, he mumbled instead of speaking clearly. Although Henkel did not use the word "nervous" in his report, he "document[ed] the nervous indicators," namely, the hands at 10 o'clock and 2 o'clock on the steering wheel, not looking at the police officer, and mumbling. At Henkel's request, defendant produced his driver's license and proof of insurance. Henkel asked him about his travel plans. Defendant answered "he was going to Alabama" and that "he was driving straight through."

¶ 15    This answer caught Henkel's attention for two reasons. First, it was about a 35-hour drive from Washington to Alabama, and although it would have been possible, it would have been very unusual to drive 35 hours "straight through." Second, it appeared to Henkel from a map of the interstate highway system, which he accessed on his cell phone in his squad car, that "Illinois was way too far north" and there would have been no reason for defendant to drive

through Illinois to get from Lakewood, Washington, where, according to his driver's license, he resided, to even the northernmost city of Alabama.

¶ 16    Henkel admitted that, at the time of the traffic stop, he did not use Google Maps to look up the route from Washington to Alabama. He did so, however, in preparation for his testimony, and Google suggested several routes, none of which went directly through Illinois. When shown defendant's exhibit No. 2, he agreed it appeared to be a printout from Google Maps showing a route from Washington to Alabama that went through Illinois, "top to bottom, straight through McLean County." He testified, however: "I don't believe that this shows anything about Interstate 74 near Carlock."

¶ 17    When Henkel asked defendant what he planned to do in Alabama, he answered he was going to visit his daughter "for a few days." Henkel thought to himself it made little sense to "travel 70 hours in a car to spend two days somewhere," especially since it would have been cheaper to fly than to drive an SUV such a long way. Henkel asked defendant if his daughter knew he was coming. Initially, defendant "could not answer [him]." Henkel testified: "He mumbled something out that wasn't even a word, so I had to ask him a second time, and he finally told me that, yes, she did know."

¶ 18    Defendant was, Henkel admitted, soft-spoken. According to Henkel, however, the difficulty in understanding him lay not so much in the softness of his voice as in his mumbling. Further into the traffic stop, however, his articulation grew clearer.

¶ 19    Defense counsel asked Henkel if he saw anything suspicious on the outside of the SUV, such as any sign of a hidden compartment. Henkel answered no, but he testified that inside the SUV he saw a large amount of "road trash": at least five energy drinks and "lots of empty wrappers of several bags of beef jerky, chips, [and] snacks"—the kind of stuff that "would be

- 4 -

used to keep people up to drive long distances." He also saw "a backpack, no large amounts of luggage, [and] a large speaker box." From his vantage in the traffic stop, he could not see anything else inside the SUV.

¶ 20        Henkel gave defendant a verbal warning for an obstructed windshield and told him the traffic stop was over and he was free to leave. In fact, Henkel told defendant three times he was free to leave—but defendant stayed put. The emergency lights of the squad car remained on while Henkel was telling defendant he was free to leave.

¶ 21        After telling defendant he was free to leave and that the traffic stop was over, Henkel requested his consent to search the SUV. Defendant answered neither yes nor no. He did not express consent.

¶ 22        Henkel assured defendant that, under Illinois law, possessing less than 10 grams of cannabis or drug paraphernalia was no longer an offense for which one could be jailed. He asked defendant if he had any drug paraphernalia or small amounts of cannabis in his SUV. Defendant answered he did not.

¶ 23        Sometime after telling him the stop was over, Henkel asked defendant "about his criminal history of getting arrested in Kentucky." (The dispatcher had told Henkel that defendant had "multiple [arrests] for drug trafficking.") Defendant answered he had indeed been arrested in Kentucky but that he had turned his life around and that he now taught martial arts to the military and to the police.

¶ 24        Less than three minutes after telling defendant the third time that he was free to leave, Henkel "advised him that [he] was going to have the state police walk a canine around his car." The canine unit arrived in about 10 minutes. The dog alerted on the SUV. Henkel and the

dog's handler searched the SUV and found cannabis, whereupon Henkel placed defendant under arrest.

¶ 25    Defense counsel asked Henkel to summarize why, before calling for a canine unit, he believed he had reasonable suspicion that defendant was a drug trafficker. Henkel answered:

> "Um, Washington plates, driving below the posted speed limit, that he would not look over at me when I pulled up alongside of him, that he initially did not stop and then stopped upon a guardrail, that he continued to not look at me during the traffic stop, that he mumbled his words, [and] that he was driving 35 hours minimum to stay somewhere two days is unreasonable. It would not be a cost efficient trip to drive a vehicle that size 35 hours. It would be cheaper to fly. He would be off[-]route, in my opinion, and his criminal history for controlled substance trafficking."

¶ 26    On cross-examination by the prosecutor, Henkel testified that, in addition to taking the standard 12-week course at the police training institute, he had taken several "drug interdiction classes." The prosecutor asked him what he had learned in the drug interdiction classes. Henkel answered:

> "A. They teach you the indicators of criminal activity.
>
> Q. And what do they tell you to look for?
>
> A. The stuff that I observed on this stop. They tell you source dates. You learn about how narcotics move from the south to the north and from the west to the east. Driving behaviors.
>
> Q. Okay.

A. Reactions upon seeing a marked squad car[,] implausible stories, implausible travel plans, travel plans that are not cost efficient, physical indicators of nervousness beyond, you know, the ordinary nervousness that you see during a normal traffic stop where there's no criminal activity involved.

* * *

Q. All right. And you mentioned the driving under the speed limit. What types of behavior are you looking for?

A. You are looking for nervousness.

Q. Nervousness?

A. And nervousness that goes way beyond, because most people are a little nervous when they get stopped by police. You are looking for the nervousness that never subdues [*sic*] or the nervousness that's way over the top."

¶ 27    Henkel also looked for the following:

"[I]f somebody says they are going to go on a vacation, you are going to look for luggage. If there's no luggage, that would be a red flag. Why is there no luggage? If they are going on a short trip, they shouldn't have a whole lot of luggage. You'd be looking for a smaller amount of luggage, common sense things like that. You look for signs like all the energy drinks and the beef jerky, it's what we call signs of hard travel. It's somebody who's not stopping at a restaurant, they are grabbing their gas, energy drinks[,] and snacks at a gas station because they want to be back on the road as soon as possible. Nobody wants to transport a large amount of narcotics and stop at Chili's and have supper for an hour and a half. They want to get rid of those narcotics as soon as possible. They are going to

shave time off their travels by not stopping at restaurants, they are going to eat in their car, they are going to have the energy drinks to keep them awake to travel long distance."

¶ 28    Henkel remembered seeing "some jackets that were just in the vehicle [and] not inside bags." He "remember[ed] a backpack," but did not "recall any large suitcases or anything like that."

¶ 29                    2. *The DVD of the Stop*

¶ 30    Defendant's exhibit No. 4, a video of the stop, was admitted by stipulation, and the video was played in the suppression hearing.

¶ 31    It appears from the digital video disc (DVD) that when Henkel walks up to the driver's side of the SUV, he first requests defendant's driver's license and proof of insurance. He asks defendant, "You from Washington?" and tells him to take the bandana off the rearview mirror because it obstructs his vision. Defendant removes the bandana.

¶ 32    Henkel asks defendant, "Where you headin'?" and "Travellin' straight through?" A semi goes by on the highway, drowning out defendant's answer. Then Henkel asks defendant, "How long you plan on bein' there?" It is still difficult to hear defendant, but he seems to answer either "a few days" or "two days." Henkel asks defendant, "[unintelligible] know you're coming?" and then, "Anybody know you're comin'?" Defendant answers, "Yeah."

¶ 33    Henkel returns to his squad car. The dispatcher can be heard stating on the radio: "Kentucky for Joshua Thomas, male white, 6 foot, 225, born in '79, multiple for traffic, also multiple for drug trafficking and [unintelligible]."

¶ 34    Henkel again approaches the SUV. At his request, defendant pulls forward, past the guardrail and the overpass. Henkel goes to the passenger side of the SUV with what appears

to be documents in his hand. He leans into the front passenger window, so that his forearms go into the open window, and tells defendant, "Ah, the traffic stop's over, ah, you're free to go, all right."

¶ 35    Henkel then withdraws from the window, without the documents, and asks him, "Ahm, you said you're going to see \*\*\*Alabama?" Defendant answers, "Yes, sir." Henkel asks him, "How old's your daughter?" "She 14," defendant replies. Henkel says, "Fourteen. OK. She does know you're comin'?" "Yes," defendant answers. Henkel says, "OK. All right. Um, did you get arrested in Kentucky a while back?" Defendant says, "Yeah. It's been a long time ago." Henkel asks him, "What was that for?" Defendant explains he used to have a "bad habit" and that he "went down a bad path" but that he had "changed [his] life" and "now [taught] martial arts" to "law enforcement and military." Henkel makes appreciative noises.

¶ 36    Then Henkel tells defendant, "Um, we're out working a drug interdiction detail today. I'm not accusing you of anything. Do you have any contraband in the car, any large amounts of money, firearms, anything like that?" Defendants denies having any of those things. Henkel then asks him, "No? Would it be OK if I searched your car?" Defendant responds, "What'd you pull me over for?" Henkel answers, "I pulled you over for having an obstructed windshield." Defendant asks, "You said I'm free to go?" Henkel says, "Yeah." Defendant says, "All right, well, thank you, sir." Henkel says, "All right. Have a safe trip." Defendant says, "All right, you have a good one."

¶ 37    Henkel then tells defendant, "Tell you what, um." The taillights of the SUV light up, but the SUV does not move. Henkel says, "Um." The taillights go off. Henkel continues, "You don't want me, you don't want me searching your car, right?" Defendant again asks, "You said I was free to go?" Henkel answers, "Yeah." Defendant says something unintelligible.

Henkel explains to him that, in Illinois, "if you have any personal use cannabis, or anything like that, or drug paraphernalia, that's not, it's not even arrestable anymore, it's a simple ticket." Henkel asks him, "Do you have anything like that in your car?" Defendant answers, "No," and says he does not smoke. Henkel tells him, "OK. All right. All right. Ahm, I'm gonna have, ah, the state police walk their K-9 around your car, and if it doesn't alert, obviously then I won't search your car, all right? All right. Cool."

¶ 38    Henkel walks back to his squad car. About two minutes later, he returns to the SUV and tells defendant, "Trooper's here, just put up your windows, all right?" and then walks back to his squad car.

¶ 39    The DVD shows the dog and its handler, the state trooper, doing the walk-around. The dog alerts on the SUV. Henkel asks defendant to get out. Henkel and the trooper then search the SUV and find the cannabis. Henkel places defendant under arrest.

¶ 40    After the DVD was played, the trial court stated it would take the matter under advisement.

¶ 41                    3. *The Trial Court's Decision*

¶ 42    In a hearing on June 7, 2017, the trial court found that Henkel had probable cause to pull defendant over for an obstructed windshield and that the traffic stop "was reasonable in [its] duration, at least related to the initial reason for the stop"—"within a reasonable amount of time, [Henkel] informed the defendant that [the] traffic stop was over, he was free to go." Soon afterward, though, Henkel "more or less inform[ed] the defendant, 'Well, you're free to go, but guess what? You're not going to go, because here's what I'm going to do: We're going to have a K-9 walk around your car.' " The court found that "at no time did the defendant consent to that extra detention" and, thus, even though "[t]he traffic stop was clearly over at that point," Henkel

"was still detaining the defendant on the side of the road[,] waiting for the K-9." The question then became whether Henkel had reasonable suspicion of a drug offense to justify detaining defendant for the dog sniff.

¶ 43　　　　The trial court reasoned as follows:

"The [c]ourt certainly acknowledges that I think there was some good police work done in this case. I think the officer had good instincts, was relying on his training, and so forth in believing that something was up here; and so he wanted to further investigate. The [c]ourt doesn't find any fault, frankly, with the officer for that.

But the legal question here is: Do those things—taken as a whole, looking at the totality of the circumstances—rise to the level of reasonable grounds to detain the defendant's vehicle for the K-9 to arrive and conduct the sniff[?] And after viewing the video, listening to the arguments of counsel, the [c]ourt finds that it does not.

The [c]ourt does not believe there [were] reasonable grounds [to] detain the vehicle. While those things individually certainly gave the officer suspicion, the [c]ourt believes that's all it is—was suspicion, as opposed to reasonable grounds to continue a detention.

For those reasons, the [c]ourt finds that the detention was unlawful at that point, and the [c]ourt is going to grant the defendant's motion to suppress."

¶ 44　　　　On June 12, 2017, the trial court denied the State's motion for reconsideration.

¶ 45　　　　This appeal followed.

¶ 46　　　　　　　　　　　　II. ANALYSIS

- 11 -

¶ 47                    A. Defendant's Objections to the State's Brief

¶ 48                    1. *The Purported Violation of Rule 342*

¶ 49          Defendant objects that, by omitting an appendix, the State's brief fails to comply with Illinois Supreme Court Rule 342 (eff. July 1, 2017). Rule 342 is in article III of the Illinois Supreme Court Rules (Ill. S. Ct. Rs., art. III), an article titled "Civil Appeals Rules." The present appeal is a criminal appeal, not a civil appeal. Therefore, unless some authority provides otherwise—defendant cites none—Rule 342 is inapplicable to briefs filed in this appeal.

¶ 50          Illinois Supreme Court Rule 612(b) (eff. July 1, 2017), which is in article VI (Ill. S. Ct. Rs., art. VI), an article titled "Appeals in Criminal Cases, Post-Conviction Cases, & Juvenile Court Proceedings," makes certain civil appeal rules applicable to criminal appeals "insofar as appropriate," but as of the amendment of June 22, 2017, Rule 342 is not one of them. Therefore, defendant's objection to the lack of an appendix required by Rule 342 is unmeritorious.

¶ 51                    2. *"A New Demonstrative Exhibit"*

¶ 52          In the statement of facts in its brief, the State recounts what Henkel and defendant said and did in the DVD. Defendant objects that "[t]his is nothing more than a newly submitted demonstrative exhibit, placed inside of an appeal brief," and he complains that his counsel "can neither cross[-]examine the prosecutor on her 'perception' or her interpretation of the video nor cross[-]examine the [d]eputy as to whether or not the prosecutor's perception is accurate." Therefore, defendant requests that we strike the corresponding pages in the State's brief.

¶ 53          We deny the request because, by representing to us what was said and done in the DVD and by supporting its representations with time-elapsed citations to the DVD, the State is merely following Illinois Supreme Court Rule 341(h)(6) (eff. Nov. 1, 2017), a civil appeals rule

that Illinois Supreme Court Rule 612(b)(9) (eff. July 1, 2017) makes applicable to this criminal appeal. Rule 341(h)(6) provides that the appellant's brief shall include a "[s]tatement of [f]acts, which shall contain the facts necessary to an understanding of the case, *** with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Nov. 1, 2017). The DVD is part of the record, and knowing the contents of the DVD is necessary to an understanding of this appeal. Providing time-elapsed citations to the DVD is like citing pages of the record.

¶ 54　　　　The DVD was available to defendant as he was writing his brief, just as it was available to the State. If defendant disagreed with the State's account of what was said and done in the DVD, he should have specified, in his own brief, how the State was incorrect and should have provided his own time-elapsed citations. Under Illinois Supreme Court Rule 341(i) (eff. Nov. 1, 2017), the appellee's brief must include a statement of facts "to the extent that the presentation by the appellant is deemed unsatisfactory." Insofar as the statement of facts in defendant's brief fails to contradict the statement of facts in the State's brief, including the State's description of the DVD, the presentation by the appellant is deemed to be satisfactory. See Ill. S. Ct. R. 341(i) (eff. Nov. 1, 2017).

¶ 55　　　　　　　　3. *Defendant's Claim That the State Has Forfeited*
　　　　　　　　　　*Its Argument That a Dog Sniff Is Not a Search*

¶ 56　　　　In its brief, the State acknowledges that, under *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1615 (2015), the police must have reasonable suspicion to justify *detaining* someone for a dog sniff. The State points out, however, that, under *People v. Harris*, 228 Ill. 2d 222, 242 (2008), and *Muehler v. Mena*, 544 U.S. 93, 101 (2005), a dog sniff is not, in itself, either a search or a seizure within the meaning of the fourth amendment.

¶ 57 Defendant responds that because the State, in the proceedings below, "never raised the claim that a dog sniff is purportedly not a search or seizure," "such contention and argument by the State should be stricken and considered forfeited and waived." Defendant cites *People v. Williams*, 193 Ill. 2d 306, 347 (2000), in support of the proposition that the rule of procedural forfeiture applies to the State. Also, defendant cites *People v. Turner*, 2012 IL App (2d) 100819, ¶ 44, in support of the proposition that, by failing to object in the trial court that the affidavit attached to a postconviction petition lacked a notarization, the State forfeited the objection on appeal.

¶ 58 We agree with the general proposition that the State, like any other party, can procedurally forfeit an issue. See *Williams*, 193 Ill. 2d at 347. *Turner*, however, is inapposite because, in *Turner*, the State had a *reason* to object in the trial court that the affidavit attached to the postconviction petition lacked a notarization. The postconviction proceedings were in their second stage, and the State had filed a motion to dismiss the petition. *Turner*, 2012 IL App (2d) 100819, ¶ 1. Such a motion was supposed to raise all the reasons why the petition should be dismissed. The lack of a notarization on the petition's affidavit would have been a reason to dismiss the petition. *Id.* ¶ 36. Therefore, in the trial court, the State had a reason to raise the lack of a notarization, and, on appeal, the State could be fairly faulted for having failed to do so in the trial court. *Id.* ¶ 44.

¶ 59 In the present case, by contrast, it would have been superfluous for the State to argue to the trial court that a dog sniff was neither a search nor a seizure. The State had to respond to defendant's motion for suppression, and the motion did not make the legally untenable claim that a dog sniff was, in itself, a search or a seizure. Instead, the motion argued that Henkel unreasonably prolonged the traffic stop to conduct a dog sniff. Stating the obvious—

that a dog sniff was not, in itself, a search or seizure—would have been unresponsive to defendant's argument. We do not require parties to randomly and pointlessly make arguments in the trial court just for the sake of making arguments. The party had to have a reason to make the argument below.

¶ 60        Even though it was not an issue below, the State has prudentially chosen to remind us that a dog sniff is not, in itself, a search or a seizure, so that we will avoid the mistake of affirming the trial court's judgment on that basis. See *People v. Sims*, 167 Ill. 2d 483, 500-01 (1995) ("[T]his court may affirm a trial court's suppression ruling for any reason appearing in the record, regardless of whether such reason was expressly noted by the trial court in reaching its conclusion."). We agree with the reminder (see *Harris*, 228 Ill. 2d at 242; *Illinois v. Caballes*, 543 U.S. 405, 408 (2005))—which, contrary to defendant's argument, is not forfeited.

¶ 61                    4. *Defendant's Objection That the State Now*
                    *Disputes a Point It Conceded in the Trial Court*

¶ 62        The State's position on appeal is that, after Henkel ended the first detention of defendant by returning his documents to him and telling him he was free to go, he and defendant had a consensual encounter, in which he asked questions of defendant, and that, after this consensual encounter, he then detained defendant a second time by telling him he was going to have a dog smell his vehicle. In other words, it is the State's position that there was a consensual encounter sandwiched between two detentions.

¶ 63        Defendant argues that this position contradicts a concession the prosecutor made in her closing argument to the trial court, and defendant, therefore, requests that we "strike" from the State's brief any "references to a purported consensual encounter with the [d]efendant." Assuming, for the sake of argument, that striking language from the State's brief would be the correct remedy, we deny defendant's request because it appears that when the prosecutor

conceded to the trial court that there had been "no consent," the prosecutor meant only that defendant had never consented to remaining at the scene for a dog sniff.

¶ 64        Not even defense counsel took the position that, after telling defendant he was free to go, Henkel lengthened the seizure merely by asking him questions. The concluding sentence of defense counsel's closing argument to the trial court was "And, in the case at hand, there's a second seizure, there's no consent, and it needs to be suppressed." If there was, as defense counsel argued, a "second seizure," the first seizure necessarily ended—otherwise, there could not have been two seizures. It follows that what happened between the first seizure and the second seizure was not a seizure, *i.e.*, it was consensual. Therefore, when the prosecutor, in the first sentence of her response to defense counsel's closing argument, stated: "Your Honor, the State is conceding that there's no consent in this case," the prosecutor apparently was agreeing with defense counsel that there was a second seizure preceded by a consensual encounter. "No consent," in context, meant that defendant did not consent to awaiting the arrival of the canine unit and undergoing a dog sniff. Thus, contrary to defendant's claim, we find no contradiction between the concession the prosecutor made in her closing argument to the trial court and the position the State takes on appeal.

¶ 65                B. The Reasonable Duration of the Initial Detention

¶ 66        Unreasonable seizures and searches violate the fourth amendment (U.S. Const., amend. IV) as well as a similar provision of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). "Under the doctrine known as 'the fruit of the poisonous tree,' a violation of the fourth amendment is considered to be, metaphorically, the poisonous tree, and any evidence the government obtained by exploiting that violation is subject to suppression as fruit of the poisonous tree." *People v. Ferris*, 2014 IL App (4th) 130657, ¶ 66. A traffic stop is a seizure of

the person (*People v. Ramsey*, 362 Ill. App. 3d 610, 614 (2005)), and if the seizure violates the fourth amendment, any evidence the government obtains by exploiting that violation will be suppressible (*Ferris*, 2014 IL App (4th) 130657, ¶ 66). (There is an exception for good-faith mistakes by the police (*In re Jarrell C.*, 2017 IL App (1st) 170932, ¶ 34), but the State does not invoke that exception.)

¶ 67          When a police officer sees a driver commit a traffic violation, the fourth amendment allows the officer to briefly detain the driver to investigate the violation. *Ramsey*, 362 Ill. App. 3d at 614. There appears to be no dispute that Henkel had probable cause to pull defendant over for an obstructed windshield (see 625 ILCS 5/12-503(c) (West 2016)) and that the traffic stop, therefore, was a reasonable seizure (see *Ramsey*, 362 Ill. App. 3d at 614).

¶ 68          Although a police officer may stop and briefly detain a motorist when the officer has seen the motorist commit a traffic offense, the traffic stop can become an unreasonable seizure "if it is prolonged beyond the time reasonably required to satisfy its initial purpose." (Internal quotation marks omitted.) *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 9. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614. In a traffic stop, the officer's mission is to check the driver's license, find out if there are any warrants against the driver, inspect the automobile's registration and proof of insurance, and decide whether to issue a ticket. *Id.* at ___, 135 S. Ct. at 1615. In this case, the mission of the traffic stop was done when Henkel gave defendant a verbal warning for an obstructed windshield and told

him he was free to leave. As the trial court found, the traffic stop itself was reasonable in duration.

¶ 69                    C. The Release of Defendant From the Initial Detention

¶ 70          When Henkel gave defendant a verbal warning, returned his documents to him, and told him he was free to leave, the traffic stop ended. "Generally, a traffic stop ends when the paperwork of the driver *** has been returned *** and the purpose of the stop has been resolved." *People v. Leach*, 2011 IL App (4th) 100542, ¶ 12.

¶ 71          After the traffic stop ended, Henkel continued to ask defendant questions, such as how old his daughter was, whether she knew he was coming, whether defendant had any contraband in the vehicle, and whether he would consent to a search of the vehicle. The law is clear, however, that "the police may approach and question a person seated in a parked vehicle without that encounter being labeled a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 552 (2006).

¶ 72          None of the *Mendenhall* factors (named after *United States v. Mendenhall*, 446 U.S. 544 (1980)) were present to suggest that Henkel seized defendant during this questioning. He was the only police officer there at the time. See *Luedemann*, 222 Ill. 2d at 553. He did not draw his pistol. See *id.* He did not, as of yet, touch defendant. See *id.* He did not use language or a tone of voice signifying that defendant had to answer his questions. See *id.* Thus, even though, " 'practical[ly]' " and " 'realistic[ally],' " few motorists would feel free to drive away when a police officer was asking them questions (see *id.* at 556), Henkel's questioning of defendant after the traffic stop was, under *Luedemann*, a consensual encounter instead of a seizure (see *id.* at 565; *People v. West*, 2017 IL App (3d) 130802, ¶ 25; *People v. Kats*, 2012 IL App (3d) 100683, ¶¶ 21-22).

¶ 73                    D. Reasonable, Articulable Suspicion to
                          Justify the Second Seizure of Defendant

¶ 74        If a dog smells drugs in a vehicle, the police have probable cause to search the

vehicle (*People v. Easley*, 288 Ill. App. 3d 487, 492 (1997)), and if the search reveals drugs, the

police have probable cause to arrest the driver (*People v. Warren*, 2016 IL App (4th) 120721-B,

¶ 70; see *People v. Novakowski*, 368 Ill. App. 3d 637, 642 (2006); *People v. Turnbeaugh*, 116 Ill.

App. 3d 199, 205 (1983)). If, however, Henkel obtained the probable cause to search defendant's

vehicle as the result of an unreasonable seizure of defendant, the cannabis that Henkel found in

the search is suppressible as fruit of the poisonous tree. See *Ferris*, 2014 IL App (4th) 130657,

¶ 66.

¶ 75        The State does not dispute the trial court's finding that Henkel seized defendant a

second time when he told defendant: "I'm gonna have *** the state police walk their canine

around your car, and if it doesn't alert, obviously[,] then[,] I won't search your car, all right?"

Nor does the State dispute that Henkel had to have a reasonable, articulable suspicion of criminal

activity to justify this second investigative detention. See *Luedemann*, 222 Ill. 2d at 544 ("brief

investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable

suspicion of criminal activity"). The State disputes, however, the court's finding that Henkel

lacked a reasonable, articulable suspicion of drug trafficking. The State argues that, considered in

their totality, the facts known to Henkel at the time and the inferences his law-enforcement

training and experience had taught him to draw from such facts made him reasonably suspicious

and "justif[ed] the detention of defendant and his vehicle for the canine sniff and all that

followed."

¶ 76        Because Henkel was the only witness to testify in the suppression hearing and the

trial court expressed no dissatisfaction or reservations about his testimony, we assume the court

found him to be credible. Thus, our standard of review is *de novo*. See *Leach*, 2011 IL App (4th) 100542, ¶ 4. Without any deference to the trial court, we evaluate the objective reasonableness of Henkel's suspicion, considering "the totality of the circumstances—"the whole picture"—known to him at the time he told defendant he was going to have a dog smell his vehicle. (Internal quotation marks omitted.) *People v. Mata*, 178 Ill. App. 3d 155, 160-61 (1988). The "whole picture" in this case is Henkel's testimony and the DVD. His testimony appears to be consistent with the DVD. He testified he suspected defendant of drug trafficking for the following reasons—which, again, we must assess not merely individually but in their totality (see *id.*).

¶ 77                    1. *Excessive Nervousness*

¶ 78          Henkel observed that defendant was more nervous than people normally were when they were pulled over. When Henkel drew up alongside of defendant and stayed there as they were driving down the highway, he noticed that defendant was gripping the steering wheel tightly at 10 o'clock and 2 o'clock and that defendant steadfastly refrained from looking over at him—which he found to be highly unusual; almost always, in his experience, a driver would look over at him in his squad car when he pulled up alongside the driver and maintained that position. In fact, throughout the traffic stop, defendant never would look at him, and defendant's nervousness did not appear to abate. He mumbled when answering Henkel's questions, although his speech became somewhat more intelligible as the traffic stop proceeded. Although nervousness can contribute to reasonable suspicion (*People v. Moore*, 341 Ill. App. 3d 804, 811 (2003)), nervousness is not enough to arouse reasonable suspicion (see *People v. Sinegal*, 409 Ill. App. 3d 1130, 1135-36 (2011)).

¶ 79                    2. *Driving Under the Speed Limit*

- 20 -

¶ 80    Because it is illegal to drive faster than the speed limit, driving a mere two miles per hour below the speed limit does not contribute to reasonable suspicion.

¶ 81    3. *A Route That Is Out of the Way, Given
Defendant's Home State and His Purported Destination*

¶ 82    Defendant's vehicle had Washington license plates, and his driver's license would have revealed he was from Lakewood, Washington. He told Henkel he was driving to Alabama to visit his daughter. Henkel asked him if he was "[t]ravellin' straight through," and according to Henkel's testimony, defendant answered yes—we cannot hear defendant's answer on the DVD because a tractor trailer went by as he was answering Henkel. When Henkel looked at a map of the interstate highway system on his cell phone, defendant's route through McLean County, Illinois, did not make sense to him.

¶ 83    After consulting Google Maps (see *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 118 n.9), we conclude that defendant's presence on Interstate 74, near Carlock, Illinois, contributed little to reasonable suspicion. On Google Maps, one of the suggested routes from Lakewood, Washington, to Alabama is through Idaho, Montana, North Dakota, Minnesota, Wisconsin, Illinois, Kentucky, and Tennessee. In Illinois the suggested route goes through Bloomington, via Interstate 39. Carlock is only 13.4 miles from Bloomington and, therefore, is not far out of the way.

¶ 84    4. *Evidence of Hard Travel*

¶ 85    Henkel testified it was about a 35-hour drive one way from Washington to the northernmost city of Alabama and defendant told him he was driving straight through. Such a feat, Henkel testified, was possible but highly unusual. When talking with defendant during the traffic stop, he saw over five energy drinks, at least three packages of beef jerky, and potato chips and snacks. Henkel explained that such "road trash" was evidence of "hard travel."

Couriers of drugs wanted to minimize their risk by getting rid of the drugs as soon as they could. So, instead of stopping at restaurants, they typically drove straight through, keeping themselves awake and boosting their stamina by loading up on energy drinks and junk food from gas stations.

¶ 86    The problem is, innocent drivers likewise consume energy drinks and junk food to stay awake on the road, and they drive straight through to avoid spending money on hotels. Because fast-food wrappers and containers litter the floors of many cars traveling long distances on interstate highways, such supposed signs of "hard travel" contribute little to reasonable suspicion. "The facts used to support an investigatory detention are insufficient when they describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures." (Internal quotation marks omitted.) *People v. Ortiz*, 317 Ill. App. 3d 212, 225 (2000).

¶ 87            5. *Driving Instead of Flying*, *Only to Stay a Few Days*

¶ 88    Henkel observed in his testimony that it would have been cheaper to fly from Washington to Alabama than to drive the sports utility vehicle for 35 hours one way, only to stay a few days.

¶ 89    First, we note that, contrary to Henkel's testimony, "a few days" does not necessarily mean only two days. Instead, "few" means "a small number of"—which could be more than two and all the way up to whatever number one regards as the upper limit of "small." New Oxford American Dictionary 626 (2001).

¶ 90    Second, it is not unusual for people to drive even if flying would be cheaper. They want to see the scenery or stop at places along the way, or they need transportation once they

reach their destination. Defendant's choice to drive rather than to fly contributes little to reasonable suspicion. See *Ortiz*, 317 Ill. App. 3d at 225.

¶ 91                                6. *No Luggage in Sight*

¶ 92        Henkel testified he saw no luggage. He saw, however, a backpack. Not everyone owns luggage, and if defendant intended to stay only a few days with his daughter, he could have stuffed his backpack full of clothing. So, the lack of luggage other than a backpack makes no contribution to reasonable suspicion.

¶ 93                          7. *A Criminal History of Drug Trafficking*

¶ 94        The dispatcher told Henkel that defendant had "multiple for drug trafficking" in Kentucky. A criminal history and nervousness, without more, do not arouse reasonable suspicion. *People v. Davenport*, 392 Ill. App. 3d 19, 28 (2009).

¶ 95        In the totality of those circumstances, we conclude that Henkel lacked reasonable suspicion to detain defendant for the dog sniff. After telling defendant he was free to leave, Henkel did not glean any additional information that would have aroused reasonable suspicion, and yet he told defendant, "I'm gonna have *** the state police walk their K-9 around your car," thereby signifying to defendant that he was not free to leave. This was an unreasonable seizure, unsupported by reasonable suspicion of criminal wrongdoing, and, consequently, the fruit of the unreasonable seizure, the cannabis, must be suppressed as evidence.

¶ 96                                III. CONCLUSION

¶ 97        For the foregoing reasons, we affirm the trial court's judgment.

¶ 98        Affirmed.