NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221115-U

NO. 4-22-1115

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| MARY C. VINCENT, | ) | No. 21CF171 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice DeArmond and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed the trial court's judgment denying defendant's motion to suppress evidence where the arresting officer did not have reasonable suspicion to detain defendant for a canine sniff.

¶ 2    After the trial court denied a motion to suppress evidence filed by defendant, Mary C. Vincent, the case proceeded to a stipulated bench trial. Defendant was convicted of cannabis trafficking (720 ILCS 550/5.1(a) (West 2020)) (count I) and possession with intent to deliver cannabis (720 ILCS 550/5(g) (West 2020)) (count II). After merging the counts, the court sentenced defendant on count I, to 14 years' imprisonment. Defendant appeals, arguing that the court erred in denying her motion to suppress evidence. We reverse and remand for further proceedings consistent with this order.

¶ 3                        I. BACKGROUND

¶ 4    On November 4, 2021, defendant was charged with the aforementioned offenses. In count I, the State alleged that on October 15, 2021, defendant, while driving from California, knowingly brought 2,500 or more grams of cannabis into Illinois for the purpose of delivering said cannabis. In count II, the State alleged that on October 15, 2021, defendant knowingly possessed, with the intent to deliver, more than 5000 grams of a substance containing cannabis.

¶ 5    On February 7, 2022, defendant filed a motion to suppress evidence of cannabis that was obtained during a search of her vehicle. The trial court held a hearing on the motion on April 4, 2022.

¶ 6    At the hearing, defendant called Lieutenant Timothy Sweeney of the Illinois State Police as a witness. Sweeney testified that he had 18 years' experience as a state trooper and became involved in criminal interdiction cases immediately after becoming a trooper. Throughout Sweeney's career, he self-initiated 100 traffic stops that were Class X-level trafficking cases. Additionally, Sweeney had been "involved in approximately 400 of these types of cases" as a backup officer or supervisor of criminal interdiction units. Sweeney reported that he attended several drug interdiction training courses since 2006. For the last 10 years, Sweeney instructed cadet classes in interdiction techniques at the Illinois State Police Academy.

¶ 7    Sweeney testified that on October 15, 2021, he was patrolling Interstate 74 when he observed defendant driving a white vehicle with Nevada license plates three miles over the posted speed limit of 70 miles per hour. Sweeney followed defendant's vehicle and entered its license plate number into the Law Enforcement Archival Reporting Network (LEARN), a license plate reader database. Sweeney explained that LEARN was a fixed camera system that captured passing vehicles' data and imported the information into a database that officers could access to determine "where that license plate has been." Sweeney determined from the LEARN database

that defendant's vehicle crossed the California-Nevada border on Interstate 80 on October 13 at 10:28 a.m. Sweeney then stopped defendant's vehicle. As he approached the vehicle, he noticed that it appeared to have driven through rain or snow because there was grime on it. According to Sweeney, it appeared the trunk had not been accessed, because there were no handprints or markings indicating that the trunk had been opened or closed.

¶ 8    A video of the stop taken from Sweeney's squad car was entered into evidence. In the video, which this court has reviewed, Sweeney made contact with defendant at the 01:54 time stamp. Defendant informed Sweeney that the vehicle was a rental, and Sweeney asked for the rental contract. Sweeney informed defendant that he stopped her for speeding, and defendant acknowledged that she was traveling at 73 miles per hour. Sweeney then asked defendant to accompany him to his vehicle to review her license, and defendant agreed. While waiting for defendant to exit her vehicle, Sweeney observed a dog in the vehicle and no luggage in the back seat.

¶ 9    Once in Sweeney's squad car, Sweeney began processing defendant's information. Sweeney testified that, over the next approximately 13 minutes, he entered into his computer defendant's driver's license information, vehicle information, and the details of the traffic stop. As Sweeney did so, he engaged in conversation with defendant. Sweeney asked defendant about her destination, and defendant answered that she was traveling to Columbus, Ohio, to see family. Several times during the conversation, defendant referred to her dog as "Doobie." Defendant stated that she last traveled to Columbus on the same route approximately six months prior. At the 05:41 time stamp, Sweeney requested a police canine. Defendant asked if her driver's license was "not good." Sweeney responded that the license was "good" and told defendant that he intended to write a warning. Sweeney then asked defendant if she ever flew to Columbus. Defendant responded that

she did fly sometimes, but it was difficult to get a license for her dog to fly with her. Defendant explained that she had been stopping at hotels during the trip. Sweeney asked if defendant had ever "been in trouble for anything," and defendant responded that she had been "years ago."

¶ 10         At the 16:30 time stamp, Sweeney handed a warning to defendant and informed her that they were "all done with the traffic stop." Sweeney then asked defendant if he could ask her some questions, and defendant answered, "[S]ure." Sweeney asked about the contents of defendant's vehicle, and defendant responded that nothing inside it would get her in trouble. At the 17:10 time stamp, Sweeney asked for permission to search the vehicle. Defendant responded that she "really would like to go." Sweeney then informed defendant that she was being "detained for a canine" to conduct a sniff. They waited several minutes for another officer, who arrived and conducted a sniff search at the 20:07 time stamp. Approximately 30 seconds later, the canine provided a positive alert. Sweeney then searched defendant's vehicle, revealing apparent cannabis in the trunk.

¶ 11         Sweeney testified that, prior to giving defendant the warning for speeding, he believed several factors gave him reasonable suspicion to detain defendant for a canine sniff of the vehicle. Sweeney testified that he considered the fact that defendant was "coming from Northern California" because that region was a "source area" he had "seen again and again and again as from [sic] cannabis traffickers." Similarly, Sweeney found defendant's traveling to Columbus significant because he had been involved in "countless narcotics trafficking cases" where the destination was "specifically Columbus." Sweeney also considered the facts that defendant "was in a rental car [that] was dirty" and that the "trunk appeared not to have been accessed since it was rented" because there were no handprints or markings on it. Sweeney explained that most cannabis trafficking cases he encountered involved cannabis in the trunk of the vehicle. Sweeney testified

that the presence of a dog in the vehicle was another factor he found significant. Sweeney explained that, while he could not "put myself in everyone's head, *** I think that they do it to dissuade police [canines] from scanning the vehicle and also dissuade dogs from alerting to the vehicle." However, Sweeney acknowledged that he could not remember any case he handled "where that defense was used." Sweeney also noticed that defendant's dog's name was "Doobie," which meant "a small amount of cannabis." Sweeney testified he also found significant the fact that defendant was driving from California to Columbus instead of flying, because it would have been less expensive for defendant to fly. Sweeney acknowledged that many individuals have a preference between driving and flying and that defendant had referred to the difficulty of obtaining a license for her dog to fly. Even so, Sweeney explained that he found driving from California to Ohio "inconsistent with the innocent motoring public." Sweeney testified that he also "put some stock" in the fact that defendant had previously been arrested for cannabis possession and sales. Sweeney noted, however, that he "called for a dog before I even noticed that" based upon "what I had already seen." Sweeney testified that he did not indicate in his report that he smelled an odor of marijuana or that defendant appeared nervous.

¶ 12　　　　Following Sweeney's testimony, the trial court denied defendant's motion to suppress. After determining that Sweeney had a basis to stop defendant for speeding, the court concluded that Sweeney also had reasonable suspicion to detain defendant for a canine sniff after the traffic stop concluded. The court explained that, although the factors Sweeney relied upon in deciding whether to detain defendant were "innocent," they were nevertheless specific and articulable facts which, in Sweeney's training and experience, indicated that criminal activity was occurring.

¶ 13          On November 3, 2022, the trial court conducted a stipulated bench trial. The parties stipulated that Sweeney's squad car video of the traffic stop would be considered an exhibit. The parties also stipulated that the State would adduce testimony from Sweeney largely reiterating the testimony he gave at the motion to suppress hearing. Additionally, Sweeney would testify that he located 22 bundles, weighing 31 pounds in total, of what appeared to be cannabis in the trunk of defendant's vehicle. The parties further stipulated that a forensic scientist with the Illinois State Police forensic crime lab would testify that testing of two of the bundles established that they contained 5353 grams of cannabis. Finally, the parties stipulated that defendant would testify that she lived in Northern California, possessed a medical cannabis license, grew and used cannabis medically, and was compliant and did not appear nervous during the traffic stop.

¶ 14          The trial court found defendant guilty of both cannabis trafficking and possession with intent to deliver cannabis. After determining that the counts merged, the court sentenced defendant on the cannabis trafficking count to 14 years' imprisonment.

¶ 15          This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17          Defendant argues that the trial court erred in denying her motion to suppress, because Sweeney lacked reasonable suspicion to detain her after he completed the traffic stop by issuing her a warning.

¶ 18          This court employs a two-part standard of review when reviewing a ruling on a motion to suppress. *People v. Bass*, 2021 IL 125434, ¶ 21. We will reverse the trial court's findings of fact only if they are against the manifest weight of the evidence. *Bass*, 2021 IL 125434, ¶ 20. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v.*

*Patton*, 2022 IL App (4th) 210561, ¶ 88. The trial court's conclusions of law, by contrast, are reviewed *de novo*. *Patton*, 2022 IL App (4th) 210561, ¶ 88.

¶ 19        Both the United States Constitution and the Illinois Constitution prohibit unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The touchstone of fourth amendment analysis is the reasonableness in all the circumstances of the governmental invasion of a citizen's personal security. *People v. Carter*, 2021 IL 125954, ¶ 22.

¶ 20        A traffic stop constitutes a seizure of the person, and if the seizure violates the fourth amendment, any evidence the State obtains as a result of that violation is suppressible. *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 66. While a police officer may stop and briefly detain a motorist when the officer observes the motorist commit a traffic offense, the traffic stop can become unlawful if it is prolonged beyond the time reasonably required to satisfy the stop's initial purpose. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. The appropriate duration of police inquiry in relation to traffic stops is determined by the mission of the seizure, *i.e.*, addressing the traffic violation that warranted the stop. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. The mission of the stop amounts to checking the driver's license, finding out if there are any warrants against the driver, inspecting the vehicle's registration and proof of insurance, and deciding whether to issue a ticket. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. An officer may conduct checks unrelated to the traffic stop's mission, but the officer may not do so in a way that prolongs the stop unless he or she has the reasonable suspicion ordinarily demanded to justify detaining an individual. *People v. Drain*, 2023 IL App (4th) 210355, ¶ 43. In other words, when an officer, while investigating a traffic violation and issuing a ticket, develops reasonable suspicion a different crime has been or is being committed, further detention may be warranted. *People v. Patel*, 2020 IL App (4th) 190917, ¶ 16.

¶ 21 Reasonable suspicion is defined as the articulable, specific facts and the rational inferences therefrom that suggest a crime has been or is about to be committed. *Patel*, 2020 IL App (4th) 190917, ¶ 15. While reasonable suspicion is a less demanding standard than probable cause, the officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity. *Patel*, 2020 IL App (4th) 190917, ¶ 15. An officer need not rule out the possibility of innocent conduct, as reasonable suspicion may emerge from seemingly innocent, non-criminal activity. *People v. Hill*, 2019 IL App (4th) 180041, ¶ 13; *People v. Smith*, 331 Ill. App. 3d 1049, 1055 (2002). However, an officer must have a particularized and objective basis for suspecting that the stopped individual was violating the law. *People v. Gaytan*, 2015 IL 116223, ¶ 20. When considering a police officer's conduct in detaining an individual based upon reasonable suspicion, we apply an objective standard—whether the " 'totality of the facts and circumstances known to the officer at the time of the stop would warrant a reasonable and prudent person to believe a crime had been committed.' " *Patel*, 2020 IL App (4th) 190917, ¶ 16 (quoting *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 73).

¶ 22 Given this framework, the relevant questions are: (1) whether the initial traffic stop was valid, (2) if the stop was valid, whether it was prolonged beyond the time necessary to complete the mission of the stop, and (3) if the stop was prolonged, whether the continued detention of the defendant was supported by a reasonable suspicion. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 36.

¶ 23 Here, defendant does not contest that Sweeney legally initiated the traffic stop, as she concedes that she was traveling 73 miles per hour on a road with a posted speed limit of 70 miles per hour. The State, in turn, acknowledges that the traffic stop was prolonged because Sweeney detained defendant for approximately four minutes to wait for a canine after giving her

a written warning. Instead, the parties dispute whether Sweeney's detention of defendant following the traffic stop's conclusion was supported by reasonable suspicion.

¶ 24    Defendant argues that the factors Sweeney relied upon to justify her continued detention were not, in their totality, sufficient to give rise to a reasonable suspicion, because they described a large category of "presumably innocent travelers." The State responds that Sweeney had reasonable suspicion that defendant was engaged in criminal activity based upon the facts known to him at the time of the stop and the inferences that his experience in law enforcement taught him to draw from those facts.

¶ 25    In making her argument, defendant relies predominantly upon *Thomas*. We find *Thomas* instructive. In *Thomas*, the defendant was charged with several drug offenses after a canine alert on his vehicle led to the discovery of cannabis. *Thomas*, 2018 IL App (4th) 170440, ¶ 4. The defendant filed a motion to suppress evidence, arguing that the officer who pulled him over for an obstructed windshield unreasonably prolonged the stop, thereby subjecting him to an unlawful seizure. *Thomas*, 2018 IL App (4th) 170440, ¶ 6.

¶ 26    At the hearing on the motion to suppress, the officer testified that he observed the defendant's vehicle traveling on the highway two miles under the speed limit with a bandana hanging from the rearview mirror that appeared to be obstructing the defendant's view. *Thomas*, 2018 IL App (4th) 170440, ¶ 11. The officer briefly drove alongside the defendant's vehicle and saw the defendant holding his steering wheel tightly while refusing to look at the officer. *Thomas*, 2018 IL App (4th) 170440, ¶ 12. After stopping the defendant, the officer asked him about his travel plans. *Thomas*, 2018 IL App (4th) 170440, ¶ 13-14. The officer testified that the defendant still refused to look at him and appeared to be very nervous. *Thomas*, 2018 IL App (4th) 170440, ¶ 14. The defendant's license showed that he resided in Lakewood, Washington, and the defendant

stated that he was driving " 'straight through' " to Alabama to visit his daughter for " 'a few days.' " *Thomas*, 2018 IL App (4th) 170440, ¶¶ 14, 17. A backpack, several energy drinks, and beef jerky wrappers were inside the vehicle. *Thomas*, 2018 IL App (4th) 170440, ¶ 19. The officer testified that he gave the defendant a warning for an obstructed windshield but that the defendant stayed put even after being told several times that he was free to leave. *Thomas*, 2018 IL App (4th) 170440, ¶ 20. The officer then learned that the defendant had a criminal history for drug trafficking. *Thomas*, 2018 IL App (4th) 170440, ¶ 23. Three minutes after last telling the defendant he could leave, the officer informed the defendant that he was requesting a canine, and the canine arrived ten minutes thereafter. *Thomas*, 2018 IL App (4th) 170440, ¶ 24. The canine alerted to narcotics, and a search of the vehicle revealed cannabis. *Thomas*, 2018 IL App (4th) 170440, ¶ 24.

¶ 27        When asked why he believed he had reasonable suspicion that the defendant was a drug trafficker, the officer responded,

> "Washington plates, driving below the posted speed limit, that he would not look over at me when I pulled up alongside of him, that he initially did not stop and then stopped upon a guardrail, that he continued to not look at me during the traffic stop, that he mumbled his words, [and] that he was driving 35 hours minimum to stay somewhere two days is unreasonable. It would not be a cost efficient trip to drive a vehicle that size 35 hours. It would be cheaper to fly. He would be off[-]route, in my opinion, and his criminal history for controlled substance trafficking." *Thomas*, 2018 IL App (4th) 170440, ¶ 25.

The officer also found the absence of luggage but the presence of " 'signs of hard travel' " like energy drinks and beef jerky significant, explaining that traffickers "want to be back on the road" and "get rid of those narcotics as soon as possible." *Thomas*, 2018 IL App (4th) 170440, ¶ 27.

¶ 28        The trial court granted the defendant's motion to suppress, and this court affirmed, concluding that "[i]n the totality of [the] circumstances, *** [the officer] lacked reasonable suspicion to detain [the] defendant for the dog sniff." *Thomas*, 2018 IL App (4th) 170440, ¶¶ 43, 95. We explained that (1) nervousness and a criminal history alone were not enough to arouse reasonable suspicion, (2) driving under the speed limit did not contribute to reasonable suspicion, since it is illegal to drive faster than the speed limit, (3) contrary to the officer's opinion, the defendant was not on a route that was "far out of the way," because he was only a few miles off of a suggested Google Maps route from Lakewood, Washington, to Alabama, (4) the consumption of energy drinks and junk food on long trips was common and described a very large category of presumably innocent travelers, (5) it was not unusual for people to drive, even if flying would be less expensive, and (6) not everyone owns luggage, and the defendant's backpack could have been stuffed with clothing. *Thomas*, 2018 IL App (4th) 170440, ¶¶ 76-95. We concluded that, based on the totality of the facts relied upon by the officer, the officer lacked reasonable suspicion, and therefore, the defendant's seizure was unreasonable. *Thomas*, 2018 IL App (4th) 170440, ¶ 95. Accordingly, we determined that the evidence of cannabis obtained via that unreasonable seizure needed to be suppressed. *Thomas*, 2018 IL App (4th) 170440, ¶ 95.

¶ 29        In evaluating the objective reasonableness of Sweeney's suspicion here, we must consider the totality of the circumstances known to him when he detained defendant for a canine sniff. *Thomas*, 2018 IL App (4th) 170440, ¶ 76. To justify defendant's continued detention, Sweeney explained that he relied upon the following factors: (1) defendant was traveling in a rental car from Northern California to Columbus, Ohio, (2) the trunk, dirty from grime, did not appear to have been accessed since the vehicle was rented, (3) defendant had a dog named "Doobie" with her, (4) defendant was driving to Columbus even though it would have been less expensive to fly,

and (5) defendant had previously been arrested for cannabis possession and sales. Like *Thomas*, we conclude that, under the totality of the circumstances, Sweeney lacked reasonable suspicion to warrant prolonging defendant's detention for a canine sniff.

¶ 30    The fact that defendant was traveling in a rental car from Northern California to Columbus was too unparticularized to support a reasonable suspicion of criminal activity. In *People v. Ortiz*, 317 Ill. App. 3d 212, 216, 225 (2000), for example, the appellate court determined that the fact that the defendant was driving to Aurora, Illinois, did not support a reasonable suspicion that the defendant was engaged in drug trafficking, even though the officer knew that destination to be a " 'hotbed' " for drugs. The court explained that this fact described a large category of presumably innocent travelers who would be subject to virtually random seizures. *Ortiz*, 317 Ill. App. 3d at 225. Thus, although Sweeney knew Northern California to be a "source area" for drugs and he had been involved in several narcotics trafficking cases where Columbus was the destination, the mere fact that defendant was traveling from California—her state of residence, no less—to Columbus in a rental vehicle was too general to justify detaining defendant for a canine sniff. See *People v. Ruffin*, 315 Ill. App. 3d 744, 750 (2000) (stating the facts that the defendant was driving a rental car and had traveled from Southern California to Mexico, then to New York did "not give rise to a reasonable and articulable suspicion that the defendant was trafficking in cannabis").

¶ 31    The absence of handprints in the grime on the trunk of defendant's vehicle was also too general to support a reasonable suspicion that defendant was committing a crime. Sweeney testified that the lack of markings led him to believe that defendant was trafficking drugs because "the trunk appeared not to have been accessed since it was rented," and traffickers tended to place drugs in the trunk, not luggage that would be frequently accessed on a long trip. However, nothing

in the record indicated the length of time the grime was on the vehicle. Sweeney's conclusion that the trunk had not been accessed for several days relied upon his assumption that the grime was present when defendant rented the vehicle or had accumulated very soon thereafter. None of the facts known to Sweeney at the time of the stop, however, supported this. For all Sweeney knew during the traffic stop, the grime could have accumulated at any time during defendant's long trip, including just hours before the stop. In other words, defendant's access to the trunk did not necessitate the presence of markings or fingerprints. Accordingly, the lack of handprints on the trunk of defendant's vehicle was too unparticularized to support reasonable suspicion. See *Thomas*, 2018 IL App (4th) 170440, ¶ 92 (stating the defendant's use of a backpack but not luggage on a long trip did not contribute to reasonable suspicion, because the officer's assumption that this suggested criminal activity failed to account for the possibility that the defendant was using the backpack to hold clothing in lieu of luggage).

¶ 32   Nor did the presence of a dog in defendant's vehicle give rise to reasonable suspicion. It is common for drivers to travel with their pets in their vehicles. If we were to deem that the presence of a dog in a vehicle creates reasonable suspicion, we would be giving the police unfettered discretion to intrude into the lives of this broad category of innocent travelers. " 'The facts used to support an investigatory detention are insufficient when they describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures.' " *Thomas*, 2018 IL App (4th) 170440, ¶ 86 (quoting *Ortiz*, 317 Ill. App. 3d at 225). Moreover, this factor is particularly weightless in this case, as Sweeney failed to articulate why the presence of a dog suggested criminal activity. Sweeney testified only that he *thought* traffickers traveled with dogs to "dissuade" police canines from providing positive alerts but acknowledged that he could remember no case he handled in which that explanation "was used." Additionally, the fact that the

name of defendant's dog was "Doobie" did not support an inference that defendant was engaged in criminal activity.

¶ 33        Next, Sweeney's determination that it was suspicious that defendant was driving from Northern California to Columbus when flying would have been less expensive lacked the particularized and objective basis necessary to suspect defendant of a crime. Sweeney's conclusion was derived almost entirely from his subjective belief of what was reasonable under the circumstances. However, travelers commonly drive on long trips even if flying would be less expensive. *Thomas*, 2018 IL App (4th) 170440, ¶ 90. For example, travelers drive instead of flying "to see the scenery or stop at places along the way, or [because] they need transportation once they reach their destination." *Thomas*, 2018 IL App (4th) 170440, ¶ 90. Indeed, here, defendant explicitly told Sweeney that it was difficult to obtain a license for her dog to fly with her, which explained her choice to drive instead of fly. Accordingly, the fact that defendant was driving to Columbus when it would have been less expensive to fly also failed to raise a reasonable suspicion.

¶ 34        Finally, the fact that defendant had a criminal history of cannabis possession and sales was insufficient to raise a reasonable suspicion. "A criminal history and nervousness, without more, do not arouse reasonable suspicion." *Thomas*, 2018 IL App (4th) 170440, ¶ 94. Here, nothing in the record established that Sweeney observed any nervousness from defendant, so defendant's mere criminal history has even less bearing upon reasonable suspicion. Moreover, Sweeney acknowledged that defendant's criminal history had little influence upon his decision to request a canine, as he did not learn of her arrests for cannabis possession and sales until after he decided to conduct a canine sniff.

¶ 35        We acknowledge that Sweeney was not required to rule out the possibility of innocent conduct. However, even when considering the factors Sweeney relied upon in their

totality, Sweeney's belief that defendant was trafficking cannabis amounted to no more than an inchoate and unparticularized hunch. We conclude that Sweeney lacked reasonable suspicion that defendant was engaged in criminal activity. Thus, Sweeney's continued detention of defendant after the conclusion of the traffic stop constituted an unreasonable seizure, and evidence of the cannabis obtained from that unreasonable seizure must be suppressed.

¶ 36                                   III. CONCLUSION

¶ 37            For the reasons stated, we reverse the trial court's judgment and remand for further proceedings consistent with this order.

¶ 38            Reversed and remanded.