NOTICE
Decision filed 02/10/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210115-U

NO. 5-21-0115

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 18-CF-424 |
| | ) | |
| TYWANNIA MOSES, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Justice Welch dissented.

**ORDER**

¶ 1    *Held*: The trial court erred in denying the defendant's motion to quash arrest and suppress evidence and motion to suppress statements because the police officer unreasonably prolonged the traffic stop beyond its mission without developing a reasonable, articulable suspicion to justify doing so.

¶ 2    Following a stipulated bench trial, the defendant, Tywannia Moses, was convicted of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401 (West 2020)). The defendant appeals the trial court's denial of his motion to quash arrest and suppress evidence and his motion to suppress statements. For the following reasons, the trial court's judgment is reversed.

1

¶ 3                                    I. BACKGROUND

¶ 4    On September 11, 2018, the defendant and his wife were traveling in a rental car from St. Louis, Missouri, to Cincinnati, Ohio. At approximately 1 a.m., Captain Ryan Weeks, a drug interdiction officer with a dog trained in detecting narcotics, was parked on the shoulder of an on-ramp of the interstate when he observed the defendant's vehicle slow down, signal, and move over into the passing lane, although there was no car to pass. Based on this driving behavior, Captain Weeks decided to follow the defendant's vehicle. As Captain Weeks followed the defendant's vehicle, he observed the vehicle's speed fluctuate between 62 and 75 miles per hour (mph). The posted speed limited was 70 mph. Captain Weeks also saw the defendant's vehicle cross the fog line. Captain Weeks proceeded to pull the defendant over and conduct a traffic stop. The traffic stop was audio and visually recorded by Captain Weeks' body camera, which revealed the following facts.

¶ 5    Captain Weeks exited his canine unit and approached the defendant's vehicle on the passenger side. Once he arrived at the passenger side window, Captain Weeks introduced himself and informed the defendant, who was the driver, and his wife, the passenger, of the reason Captain Weeks conducted the traffic stop. Captain Weeks remarked that the defendant was speeding and went over the fog line, which was indicative of a fatigued driver or someone who was driving under the influence. The defendant remarked that he saw the officer's vehicle and that he did not know what the officer wanted him to do. The defendant stated that he was a little tired. As the defendant handed Captain Weeks his license and rental agreement, the following exchange occurred:

"THE DEFENDANT: I'm nervous, I'm like ***

CAPTAIN WEEKS: Alright. Why are you nervous?

THE DEFENDANT: No, I was saying how you was *** It's 2:30 in the morning.

CAPTAIN WEEKS: Right. No, there's no need to be nervous.

THE DEFENDANT: Ok.

CAPTAIN WEEKS: Yeah. I'm just going to give you a warning ticket. I'm just making sure you're not under the influence or anything like that."

¶ 6    Next, Captain Weeks told the defendant they needed to go back to Captain Weeks' canine unit to do some paperwork. The defendant exited his vehicle. At the rear of the defendant's vehicle, Captain Weeks asked the defendant whether he had any weapons. The defendant replied in the negative, raised his arms, and turned around. Captain Weeks and the defendant then got into Captain Weeks' vehicle.

¶ 7    After getting into the canine unit, the defendant stated that he was fatigued. He went on to explain why he moved into the passing lane when he saw Captain Weeks' squad car on the on-ramp. Captain Weeks contacted dispatch three minutes and 53 seconds into the stop to call in the defendant's information. While waiting for dispatch to respond, Captain Weeks asked the defendant if he had any outstanding warrants. The defendant replied in the negative. Captain Weeks also asked the defendant what brought he and his wife to the area. The defendant indicated that they had been in St. Louis, Missouri. Dispatch confirmed the defendant had a valid license.

¶ 8    Five minutes and 10 seconds into the stop, Captain Weeks got out a warning ticket and asked the defendant if he was in St. Louis for business or pleasure. The defendant

explained that he had been at a family gathering, but they left because of a family conflict. Captain Weeks asked the defendant if he had been arrested for anything in the past. The defendant indicated that "years ago" he had been arrested for drug charges in Chicago, Illinois, from his "younger days" and that he had also gotten a ticket in the past. The defendant stated that he now owned a transportation company for the elderly. The defendant then indicated that he was now "wide awake" and asked whether the warning ticket would result in points on his license.

¶ 9 Captain Weeks began filling out the warning ticket seven minutes and 18 seconds into the stop. The defendant subsequently asked Captain Weeks why he pulled the defendant over. Captain Weeks stopped filling out the ticket and explained that the defendant had driven on the white line and that his speed was fluctuating. Captain Weeks resumed filling out the warning ticket and continued conversing with the defendant.

¶ 10 Eight minutes and 34 seconds into the stop, Captain Weeks asked the defendant if he had anything illegal in his vehicle. The defendant replied, "No…no, no, no." Captain Weeks then asked the defendant if there was any large amount of U.S. currency in his vehicle. The defendant replied, "Um no, I think she, we, went to the bank earlier, so it's not large, so we didn't know um…what it was going to be like in St. Louis but not a large amount." The defendant subsequently stated the amount was approximately $4000. The defendant confirmed that it was traveling money.

¶ 11 Captain Weeks then asked if there was any cocaine or cannabis in the defendant's vehicle. The defendant replied, "no," to each question. This was nine minutes and 19 seconds into the stop. The defendant further indicated that he and his wife did not smoke

4

or drink. Captain Weeks then asked if there was any methamphetamine in the defendant's vehicle. The defendant replied, "no drugs at all, sir."

¶ 12    Ten minutes and 14 seconds into the stop, Captain Weeks again stopped filling out the warning ticket and told the defendant that it would take him "a little bit to do some paperwork." According to the recording, it appears that Captain Weeks began inputting information into his computer, although the computer screen was not visible. Captain Weeks then asked the defendant if he had rented the car and looked at the rental agreement. Captain Weeks next asked the defendant how long he and his wife were in St. Louis. The defendant indicated that they were in St. Louis for about four or five hours. The defendant stated that they had planned to stay but left because of the family conflict. The defendant explained that they were supposed to be attending a wedding, but the wedding did not happen. The defendant remarked that "they" smoked weed, although that was not the reason he and his wife left. The defendant further remarked that there was bickering over money issues. Captain Weeks and the defendant then engaged in general conversation while Captain Weeks continued filling out the warning ticket.

¶ 13    Thirteen minutes and 30 seconds into the stop, Captain Weeks had finished filling out the top portion of the warning ticket. The next section of the ticket was labeled, "Type of Violation." This portion of the warning ticket required the officer to check boxes for the violations, fill in the alleged speed, sign his name, and fill in his badge number. Captain Weeks did not complete the warning ticket any further. Instead, he asked the defendant about the wedding the defendant was supposed to be attending. The defendant stated that

his "cousin/auntie" was getting married, and Captain Weeks asked further questions about the defendant's family.

¶ 14    Fifteen minutes and 21 seconds into the stop, Captain Weeks remarked that there was "so much more paperwork than there used to be," and stated that the computers were "handy" but a "pain to put all this information in." Captain Weeks again asked the defendant about what kind of business he owned. The defendant explained that he had a transportation business, and that they provided non-emergency medical transportation for the elderly.

¶ 15    Sixteen minutes and 24 seconds into the stop, Captain Weeks stated that he was looking for the "VIN" for the rental car. Captain Weeks was holding the rental agreement and remarked that he did not see the VIN. (We note that the warning ticket did not require a VIN to complete the citation.)

¶ 16    Seventeen minutes and nine seconds into the stop, Captain Weeks indicated that another officer had arrived on the scene and that he was going to have the other officer complete the warning ticket while he verified the VIN on the defendant's vehicle. Before exiting his canine unit, Captain Weeks asked the defendant if there was anything in his vehicle "that the dog would be interested in." The defendant replied in the negative and told Captain Weeks that the VIN was in the vehicle, and that Captain Weeks had "nothing else to worry about."

¶ 17    Captain Weeks exited his vehicle and asked the other officer to complete the warning ticket. Captain Weeks told the other officer he was going to verify the VIN and asked the defendant if it was okay to open the driver's side door to do so. The defendant

replied in the affirmative. The assisting officer then joined the defendant in the canine unit while Captain Weeks reapproached the defendant's vehicle. Captain Weeks arrived at the driver's side door, and the window was rolled down. Captain Weeks informed the defendant's wife, who had remained in the passenger seat, that he was going to open the door to verify the VIN. Before opening the driver's side door, Captain Weeks asked the defendant's wife where they were traveling from. The defendant's wife replied, "St. Louis." As Captain Weeks opened the driver's side door and looked at the inside of the door, he asked the defendant's wife why she and the defendant were in St. Louis. The defendant's wife stated "a funeral," and Captain Weeks asked who passed away. The defendant's wife indicated her aunt. Captain Weeks remarked that he did not see the VIN on the inside of the door. The defendant's wife indicated that it might be near the windshield. Captain Weeks asked whether the funeral was nice and then stated, "as nice as they can be I guess." Captain Weeks looked through the windshield and then walked to the passenger side of the defendant's vehicle. Captain Weeks asked the defendant's wife to exit the vehicle. He informed her that he was going to run his dog around the vehicle and asked if there was anything, such as small amounts of cannabis, in the car. The defendant's wife replied in the negative.

¶ 18    After the defendant's wife exited the vehicle, Captain Weeks returned to his canine unit and informed the defendant that he was going to run the dog around the defendant's vehicle. The defendant asked, "For the VIN?" Captain Weeks indicated that he did look at the VIN and asked the other officer, who was now seated in the front seat of the canine

7

unit, for a dog leash. As Captain Weeks retrieved his dog from the rear seat of the canine unit, he remarked "wedding and a funeral."

¶ 19 Twenty-one minutes and 16 seconds into the stop, Captain Weeks conducted a "free air" sniff of the defendant's vehicle. After the free air sniff was complete, Captain Weeks returned the dog to the canine unit. Captain Weeks asked the defendant if he was sure there was nothing in the vehicle, and the defendant replied, "I'm positive." Captain Weeks then asked the defendant's wife whether there was anything in the vehicle and stated that the dog "indicated" the odor of narcotics in the vehicle. The defendant's wife denied any knowledge of whether there were drugs in the vehicle.

¶ 20 Captain Weeks subsequently searched the vehicle. During the search, he pulled a carpeted panel loose, where he found $27,000 and a black bundle wrapped in rubber bands that was later determined to be cocaine. Captain Weeks told the assisting officer to have the defendant exit the canine unit. As he was being handcuffed, the defendant exclaimed, "What is that?" Although not visible on the body camera, the defendant saw a bag of cannabis on the ground. Captain Weeks stated, "No that's training. *** That was from a stop earlier. That's not yours."

¶ 21 The defendant and his wife were arrested and transferred to the justice center. Once there, the defendant was interviewed about the currency and the cocaine. During questioning, the defendant indicated that both belonged to him.

¶ 22 The State charged the defendant with unlawful possession of a controlled substance with intent to deliver. The defendant filed a motion to quash his arrest and suppress evidence and a motion to suppress statements. At a hearing on the defendant's motions, a

8

copy of the body camera footage and the warning ticket were admitted into evidence. Captain Weeks testified about the stop. Captain Weeks indicated that the defendant changed lanes and slowed below the speed limit whenever he saw Captain Weeks' canine unit. As Captain Weeks followed the defendant, the defendant's speed increased, and he crossed the fog line. Captain Weeks stated that he often sees this behavior with drivers who have suspended licenses and drug smuggling. He indicated that the person subconsciously leaves the roadway because they want to create distance from the police officer, and they are driving while looking at the police vehicle in their mirrors. Captain Weeks also admitted that a lot of innocent drivers may exhibit the same behavior. Captain Weeks further testified that as he approached the defendant's vehicle, he was concerned the car may have contraband in it.

¶ 23    Captain Weeks testified that his suspicion was raised by the defendant's statement that he had been previously arrested for drugs; the defendant's repeated response of "no" when asked about narcotics; and the defendant's increased anxiety and breathing, as well as the defendant's hands shaking when asked about cocaine. We note that the defendant is not visible on the body camera when Captain Weeks asked the defendant about the cocaine or any other drugs being in the defendant's vehicle. At the hearing, Captain Weeks indicated that the defendant had been calm until he was asked about cocaine. Captain Weeks further testified that the defendant's explanation when asked about large sums of money in the vehicle also raised his suspicion. Captain Weeks indicated that the $4000 amount did not raise his suspicion, but it was "slightly raised" by the defendant's lack of being able to structure a response. Captain Weeks stated that the defendant's response did

not make sense and appeared as if he was trying hard to explain something away. Based on his conversation with the defendant, Captain Weeks felt there was a "possibility" that he would conduct a free air sniff of the defendant's vehicle with his dog. Captain Weeks testified that his "final decision" to conduct the free sniff came after he spoke with the defendant's wife, and she gave a conflicting story about the reason for traveling to St. Louis. Captain Weeks testified that "[a]t that point[,] I was certain that I was going to deploy the K-9."

¶ 24 As to filling out the warning ticket, Captain Weeks confirmed that it would have taken, at most, a couple of minutes to complete a warning ticket. Captain Weeks admitted that when the second officer arrived, Captain Weeks "basically had knocked out everything." Captain Weeks testified that although the warning ticket did not require the vehicle's VIN, he typically verified the VIN with the information on his computer. Captain Weeks further testified that he looked at the VIN through the windshield of the defendant's vehicle. He agreed that he did not write it down, but indicated that he typically memorizes the last four digits of the VIN. He could not recall whether he did so in this case. Captain Weeks stated that his focus changed after he received the inconsistent story from the defendant's wife.

¶ 25 Captain Weeks testified that he did not recall when he requested the second officer to assist at the scene but stated that the second officer was in the vicinity the entire time. The body camera footage does not indicate when Captain Weeks contacted the second officer. Captain Weeks testified that he needed the second officer to arrive before he could conduct a free air sniff with his dog.

10

¶ 26 Following the hearing on the defendant's motions, the trial court found Captain Weeks had probable cause to believe the defendant had committed a traffic violation; the detention of the defendant was not unreasonable; the free air sniff conducted by Captain Weeks' dog was not illegal; the use of the dog by Captain Weeks and its subsequent alert on the vehicle were sufficiently compliant with Illinois law to justify probable cause to search the vehicle; the defendant's statements to Captain Weeks were voluntary; the defendant's statements were made in sufficient compliance with *Miranda*; and the evidence presented established that the defendant's statements were the result of a lawful arrest. Based on these findings, the trial court denied the defendant's motions.

¶ 27 At a stipulated bench trial, the trial court found the defendant guilty of unlawful possession of a controlled substance with intent to deliver. The court sentenced the defendant to four years' imprisonment followed by a two-year period of mandatory supervised release, and a $10,000 fine. This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29 On appeal, the defendant argues that the trial court erred in denying his motion to quash his arrest and suppress evidence because Captain Weeks impermissibly prolonged the traffic stop contrary to his Constitutional rights. He also argues that the subsequent free air sniff of the defendant's vehicle was not reliable. The defendant further claims that the trial court erred in denying his motion to suppress statements because his statements were obtained as a result of the unlawful stop.

¶ 30 We review a trial court's ruling on a motion to suppress evidence under a two-part standard of review. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The trial court's findings

11

of fact are entitled to deference and will be reversed only if they are against the manifest weight of the evidence. *Harris*, 228 Ill. 2d at 230. The trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *Harris*, 228 Ill. 2d at 230.

¶ 31 The fourth amendment of the United States Constitution (U.S. Const., amend. IV) and article I, section 6 of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) protect individuals against unreasonable searches and seizures. Under the "fruit of the poisonous tree" doctrine, evidence obtained in violation of the fourth amendment is subject to suppression. *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 66. A traffic stop is considered a seizure of the person, and if the seizure violates the fourth amendment, any evidence obtained by exploiting that violation is suppressible. *Thomas*, 2018 IL App (4th) 170440, ¶ 66.

¶ 32 When a police officer observes a motorist commit a traffic violation, the fourth amendment allows the officer to briefly detain the person and investigate the violation. *Thomas*, 2018 IL App (4th) 170440, ¶ 67. Here, Captain Weeks stopped the defendant for speeding and improper lane use violations. Thus, the initial traffic stop was a reasonable seizure.

¶ 33 Although a police officer may stop and briefly detain a motorist when the officer has observed the individual commit a traffic violation, the traffic stop can become an unreasonable seizure if it is prolonged beyond the time reasonably required to satisfy the initial purpose of the stop. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. There is no bright line rule dictating the appropriate length of a traffic stop. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009). Instead, courts employ a contextual, totality of the circumstances

12

approach that includes consideration of the brevity of the stop and whether the officer acted diligently during the stop. *Baldwin*, 388 Ill. App. 3d at 1034. The tolerable duration of police inquiries in the context of a traffic stop is determined by the mission of the seizure, to address the violation that warranted the stop. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. Thus, authority for the seizure ends when the tasks linked to the traffic violation are, or reasonably should have been, completed. *Thomas*, 2018 IL App (4th) 170440, ¶ 68. In a traffic stop, the officer's mission is to check the motorist's license, find out whether the motorist has any warrants, inspect the automobile registration and proof of insurance, and decide whether to issue a ticket. *Thomas*, 2018 IL App (4th) 170440, ¶ 68.

¶ 34    An officer may make inquiries into matters unrelated to the justification of the traffic stop, so long as those inquiries do not measurably extend the duration of the traffic stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Although a drug dog sniff is not an ordinary incident to a traffic stop, it does not trigger the fourth amendment as long as it does not prolong the duration of the stop. *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 29. To trigger the fourth amendment, there must be evidence that but for the activities unrelated to the mission of the stop, the officer would have finished writing the defendant's warning ticket and delivered it to him before the dog detected drugs in the defendant's vehicle. See *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 16 (citing *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 32).

¶ 35    In the present case, we find that Captain Weeks did not act diligently in completing the warning ticket. From the beginning of the stop, Captain Weeks indicated to the defendant that only a warning ticket would be issued. Captain Weeks testified that it would

13

have only taken, at most, a couple of minutes to complete a warning ticket. According to the body camera footage, 13 minutes and 30 seconds into the stop, Captain Weeks had only finished filling out the top portion of the warning ticket. At this point, he needed only to check the violation boxes, fill in the speed, and sign his name and badge number. Thus, the traffic stop reasonably should have been completed very shortly after Captain Weeks finished the top portion of the warning ticket.

¶ 36   Instead of diligently completing the warning ticket as he originally informed the defendant, Captain Weeks stopped filling out the warning ticket to ask the defendant about the wedding he was supposed to have attended and included questions about the defendant's family. Captain Weeks then commented that there was "so much paperwork than there used to be" and claimed that he had to put "all this information in" his computer. Captain Weeks also asked the defendant about what kind of business he owned, although the defendant had previously explained his business to Captain Weeks earlier in the stop. Next, Captain Weeks claimed he was looking for the VIN on the rental agreement paperwork, even though the VIN was not required to complete the warning ticket. We acknowledge that Captain Weeks testified that he typically verifies the VIN with the information on his computer; however, the tasks here were not related to completing the warning ticket. Thus, we are not persuaded that Captain Weeks was doing anything other than prolonging the detention of the defendant until the second officer arrived.

¶ 37   Captain Weeks testified that he could not conduct a free air sniff of the defendant's vehicle until the second officer had arrived, even though the dog was in Captain Weeks' vehicle from the outset. The second officer did not arrive until 17 minutes and nine seconds

14

into the stop, nearly four minutes after the time Captain Weeks reasonably should have completed the mission of the traffic stop. Had Captain Weeks worked diligently, the traffic stop would have been completed before the second officer arrived. The free air sniff did not even occur until 21 minutes and 16 seconds into the stop, nearly nine minutes from the time Captain Weeks should have reasonably completed the warning ticket. Thus, under the circumstances in this case, we find that Captain Weeks unreasonably prolonged the traffic stop.

¶ 38 Having determined that Captain Weeks unreasonably prolonged the traffic stop, we must next determine whether Captain Weeks' conduct in doing so was justified under the fourth amendment. If the officer discovers specific, articulable facts that give rise to a reasonable suspicion that the defendant has committed, or is about to commit a crime, the traffic stop may be broadened into an investigative detention. *People v. Ruffin*, 315 Ill. App. 3d 744, 748 (2000). Mere hunches and unparticularized suspicions are not enough to justify broadening a stop into an investigatory detention. *Ruffin*, 315 Ill. App. 3d at 748.

¶ 39 At the motion hearing, Captain Weeks testified that the following circumstances gave rise to his reasonable suspicion: (1) the defendant changed lanes and slowed down upon seeing the officer; (2) the speeding and improper lane use violations; (3) the defendant's statement that he had previously been arrested for drug charges; (4) the defendant's repeated response of "no" when asked about narcotics; (5) the defendant's increased nervousness, with increased breathing and shaking hands, when asked about cocaine; (6) the defendant's explanation as to why he and his wife had $4000; and

15

(7) Captain Weeks' conversation with the defendant's wife, wherein she indicated they had been to a funeral rather than a wedding.

¶ 40 The seventh reason stated by Captain Weeks, however, was not learned until after he unreasonably prolonged the stop and the second officer arrived on the scene. Information learned after the officer unreasonably prolongs a stop cannot be considered in evaluating whether a reasonable suspicion existed to prolong the stop. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 87. Subsequently learned information may not be bootstrapped in an attempt to establish a reasonable suspicion. *Sadeq*, 2018 IL App (4th) 160105, ¶ 87. Accordingly, we must determine whether the other circumstances cited by Captain Weeks gave rise to a reasonable suspicion.

¶ 41 Captain Weeks indicated that prior to speaking with the defendant's wife, he believed there was a "possibility" that he would conduct a free air sniff with his dog based on his conversations with the defendant. In other words, Captain Weeks only had a hunch of criminal wrongdoing, which was legally insufficient to prolong the stop. Captain Weeks' lack of a reasonable suspicion was highlighted by the fact that he did not conduct the free air sniff immediately after the second officer arrived. Instead, he claimed he needed to verify the VIN and spoke with the defendant's wife. It was not until after his discussion with the defendant's wife that Captain Weeks conducted the free air sniff. Captain Weeks testified that his "final decision" was not made until he received an inconsistent reason for travel to St. Louis from the defendant's wife, which, as we have stated, cannot be considered in forming the basis for Captain Weeks' reasonable suspicion.

16

¶ 42　We find that the information Captain Weeks possessed prior to unreasonably prolonging the stop did not give rise to a reasonable suspicion. See, *e.g.*, *Ruffin*, 315 Ill. App. 3d at 750 (finding that an officer lacked a reasonable suspicion based on the officer's knowledge that the defendant was driving a rental car, that he was nervous, that he was traveling from California to New York after having visited Mexico, and inconsistent statements between the defendant and his fiancée about who had traveled with them); *Baldwin*, 388 Ill. App. 3d at 1035 (finding that an officer lacked a reasonable suspicion based on the defendant's nervousness, heavy breathing, "right-hand placement," a faint odor of alcohol, and the defendant looking in the direction of the officer and the driver, reaching into his pocket, and reaching down along his side); *Thomas*, 2018 IL App (4th) 170440, ¶¶ 77-93 (holding the officer lacked a reasonable suspicion based on the defendant's excessive nervousness, driving 2 mph under the speed limit, out of the way route from Washington to Alabama, decision to "drive straight through" as well as other evidence of "hard travel," decision to drive an SUV instead of flying, lack of luggage other than a backpack, and criminal history for drug trafficking).

¶ 43　In sum, we find that Captain Weeks unreasonably prolonged the traffic stop without a reasonable suspicion of criminal wrongdoing. Consequently, the trial court erred in denying the defendant's motion to quash arrest and suppress evidence. The trial court also erred in denying the defendant's motion to suppress statements. See *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (citing *Brown v. Illinois*, 422 U.S. 590, 602 (1975) (a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession

17

so that the confession is sufficiently an act of free will to purge the primary taint)). The State does not cite any intervening circumstances that broke the causal connection between the defendant's arrest and his statement, and we do not find any based upon the evidence presented.

¶ 44    Before concluding, we feel compelled to address the dissent in this case. Contrary to assertions made in the dissent, our ruling does not disavow investigatory police work, create an arbitrary result, or "start a stopwatch" on police officers conducting a traffic stop. Rather, our decision is based on a contextual, totality of the circumstances approach while keeping in mind the principles that an officer may not prolong a traffic stop beyond its initial mission absent a reasonable, articulable suspicion for doing so and that authority for a seizure during a traffic stop ends when an officer has, or reasonably should have, completed the traffic stop's mission. According to Captain Weeks, writing a warning ticket should have taken no more than a couple of minutes. Our decision in this case turned upon Captain Weeks' failure to timely complete the warning ticket and, instead, engage in delay tactics to wait for the second officer, allegedly check for the VIN, and speak with the defendant's wife. Indeed, in his testimony, Captain Weeks admitted he only believed there was a "possibility" he would conduct a free air sniff prior to intentionally prolonging the stop rather than completing the warning ticket. Furthermore, the dissent contends that the defendant was "extremely nervous" throughout the stop. We do not believe the record in this case supports this assertion.

¶ 45    Finally, the dissent seems to suggest that the arrival of the second officer and the investigatory circumstances in this case included issues related to officer safety. While we

18

generally agree with the dissent that all police officers should return to their homes safely, Captain Weeks never claimed that he prolonged the stop for officer safety reasons.

¶ 46                                III. CONCLUSION

¶ 47   For these reasons, we reverse the trial court's judgment denying the defendant's motion to quash arrest and suppress evidence and his motion to suppress statements. Because the State would have been unable to prove beyond a reasonable doubt that the defendant unlawfully possessed a controlled substance without the suppressed evidence, we vacate the defendant's conviction and sentence. See *People v. Clark*, 394 Ill. App. 3d 344, 349-50 (2009). In light of our ruling, we need not consider the defendant's contention that the free air sniff was not reliable.


¶ 48   Reversed.


¶ 49   JUSTICE WELCH, dissenting:

¶ 50   In reaching its decision, the majority disavows investigative police work, and instead opts for a world in which law enforcement may not diligently protect the roads from criminal activity.  I would hold that there was a fourth amendment justification for the dog sniff based on reasonable suspicion.  As such, I respectfully dissent.

¶ 51   We review a circuit court's ruling on a motion to suppress evidence under a two-part standard of review.  *People v. Harris*, 228 Ill. 2d 222, 230 (2008).  The circuit court's findings of fact are entitled to deference and will be reversed only if they are against the

manifest weight of the evidence. *Id.* The circuit court's ultimate ruling as to whether suppression is warranted is reviewed de novo. *Id.*

¶ 52 On September 11, 2018, around 1 a.m. in the morning, Captain Ryan Weeks was parked alone on the shoulder of an on-ramp of the interstate I-64 in a marked police vehicle when he observed the defendant's vehicle move to the passing lane unnecessarily. After deciding to follow the vehicle, Captain Weeks observed the car fluctuate its speed above the speed limit and cross the white fog line. What followed was a valid traffic stop during which Captain Weeks discovered several articulable facts that supported a reasonable suspicion that a crime had been or would be committed. See *People v. Ruffin*, 315 Ill. App. 3d 744, 748 (3d Dist. 2000) ("The initial stop may be broadened into an investigative detention, however, if the officer discovers specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime.").

¶ 53 When Captain Weeks approached the defendant's vehicle, the defendant appeared very nervous even though Captain Weeks assured him there was no reason to be nervous as he was only going to issue a warning ticket. Nevertheless, the defendant was extremely nervous throughout the entire stop. Captain Weeks also learned that the defendant was driving a rental vehicle. After informing the defendant of why he stopped him, Captain Weeks received the defendant's license and car rental agreement. Captain Weeks then asked the defendant to return to his squad car with him to do some paperwork and check the rental agreement. It is not uncommon for rental cars to be used in drug trafficking schemes. Once in the squad car, Captain Weeks called in the defendant's information to dispatch in order to check for any outstanding warrants, as is protocol.

20

¶ 54   While waiting, Captain Weeks made small talk with the defendant.  During this conversation, the defendant stated he did not have any outstanding warrants (which dispatch verified), but that he did have a previous drug-related arrest when he was younger. The defendant also told Captain Weeks that he and his wife were visiting St. Louis from Cincinnati for a wedding, and that his wife had $4000 cash on her person for travelling expenses.  When Captain Weeks asked the defendant about any possible narcotics in the vehicle, the defendant answered with fervent "no's."  Furthermore, Captain Weeks keenly noticed that the defendant became more nervous exhibiting faster breathing and shaking hands when cocaine was brought up.

¶ 55   Once the second officer arrived on the scene, Captain Weeks handed the warning ticket to him to finish, while he went to check for the vehicle's VIN.  The majority states this was not required for the warning ticket, and, while true, this does not diminish the fact that Captain Weeks was simply being diligent in ensuring that the defendant's rental vehicle agreement was in fact correct.  While checking for the VIN, Captain Weeks made small talk with the wife, at which point she told him that they went to St. Louis for a funeral, which conflicted with the defendant's stated reason for the trip, a wedding.

¶ 56   In sum, Captain Weeks amassed the following specific, articulable facts that supported his reasonable suspicion: (1) that the defendant changed lanes and slowed down upon seeing the officer (activity Captain Weeks testified was typical of drug traffickers); (2) the speeding and improper lane use violations; (3) the defendant's statement that he had previously been arrested for drug-related charges; (4) the defendant's repeated and ardent response of "no" when asked about narcotics in the vehicle; (5) the defendant's increased

21

nervousness, with increased breathing and shaking hands, when asked about cocaine; (6) the $4000 the defendant's wife had on her and the reason why she had it; (7) the fact that the defendant drove from Cincinnati to St. Louis only to stay for a few hours before driving back; and (8) the conflicting statement from the defendant's wife that they had been to a funeral rather than a wedding.

¶ 57    The majority chooses not to consider the wife's conflicting statement because, as the majority asserts, it occurs after the stop was already prolonged.  This is an arbitrary line, but this kind of arbitrary result is not unexpected given the nature of the Supreme Court's holding in *Rodriguez*.  See *Rodriguez v. United States*, 575 U.S. 348, 362 (2015) (Thomas, J., dissenting).  When Captain Weeks checked for the VIN, the warning ticket was not yet completed, and therefore, the mission of the stop was not done.  It cannot be the case that Captain Weeks must ignore all of the suspicious activity he observed simply because he did not observe it all in the first four minutes of the encounter.  I do not read *Rodriguez* to hold that if law enforcement conducts a traffic stop, it must do so as fast as possible and ignore any indicia of criminal activity.  The majority would like to start a stopwatch on law enforcement; however, it is well-settled law that there is no bright-line rule on how long a traffic stop should take.  See *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009).  First and foremost, an officer's objective in enforcing the traffic code is "ensuring that vehicles on the road are operated safely and responsibly."  *Rodriguez*, 575 U.S. at 355.

¶ 58    Here, given the totality of the circumstances, Captain Weeks discovered specific, articulable facts which gave rise to a reasonable suspicion that a crime had been or would

22

be committed. Based on that reasonable suspicion, he conducted the dog sniff, wherein the dog alerted on the vehicle. This formed probable cause to search the vehicle. *People v. Pulido*, 2017 IL App (3d) 150215, ¶ 46 ("A positive alert to the presence of narcotics by a dog trained in the detection of narcotics is a permissible method of establishing probable cause." (citing *People v. Campbell*, 67 Ill. 2d 308, 315-16 (1977))). Note, that the dog was in Captain Weeks' squad car from the outset of the traffic stop; this was not a case where the officer had to wait for a dog to show up on site.

¶ 59    After establishing probable cause and searching the vehicle, Captain Weeks discovered $27,000 and half a kilo cocaine. The defendant was arrested and charged. At trial, the circuit court had the benefit of *Rodriguez*, and, after considering all of the facts before it, concluded that there was a reasonable suspicion and probable cause. I would not contradict the circuit court's findings. The circuit court found the defendant guilty and sentenced him to four years' imprisonment followed by a two-year period of mandatory supervised release, and a $10,000 fine. And at the end of this episode, fortunately, Captain Weeks safely returned home.

¶ 60    For these reasons, I would affirm the circuit court's holding and respectfully dissent.